UNITED STATES DISTRICT COURT
WESTWERN DISTRICT OF WASHINGTON

GREEN WORLD COUNCIL BLUFFS, LLC
A Washington limited liability company, and
MICHAEL KIM, an individual

        Plaintiffs,

v.

1SHARPE OPPORTUNITY INTERMEDIATE FUND,
L.P., a Cayman Island Limited Partnership, 1SHARPE
OPPORTUNITY INTERMEDIATE TRUST, a Delaware
Trust, ARCHDALE FUNDING LLC, a Delaware LLC,
BLUE FUNDING, LLC, a Delaware LLC,
CHURCHILL REAL ESTATE PARTNERS LLC, a
Delaware LLC, ALEX M. JOHNSON, an individual,
SUMMIT AND CROWNE CAPITAL PARTNERS, LLC,
a Delaware LLC, ANTHONY O'BRIEN, an individual,
ANDREW DESORBO, an individual,
TRAVIS MASTERS, an individual,
DERRICK LAND, an individual, Inclusive.

        Defendants.
_____/

Case No.:  <u>2:20-cv-1579 MAT</u>

JURY TRIAL DEMAND

Injunctive Relief Requested

## **COMPLAINT**

      Plaintiff, GREEN WORLD COUNCIL BLUFFS, LLC (hereinafter "GREEN"), by and

through its undersigned counsel, and MICHAEL KIM (hereinafter "KIM"), pro se, hereby file this

Complaint in which Plaintiffs are seeking to have judgment against the defendants and each of them

jointly and severally based on the following claims, i.e. Fraud in inducement to contract, Civil

Conspiracy to steal property by a bait and switch loan, Civil rights conspiracy under 42 U.S.C.

1983,  Racketeering practices and corrupt organizations (RICO), Declaratory Judgment regarding

the Mortgage and Note of July 16, 2018, and alleges the following in support of the requested relief:

**COUNT 1**
**THE STATE JUDGMENT IS VOID FOR LACK OF**
**SUBJECT MATTER JURISDICTION/**
**ARCHDALE LACKED STANDING AS A PLAINTIFF**

**COUNT 2**
**FRAUDULENT INDUCEMENT TO ENTER INTO CONTRACT**
**DEFENDANTS SUMMIT AND CROWNE CAPITAL PARTNERS, LLC,**
**ANTHONY O'BRIEN, BLUE FUNDING, LLC, ANDREW DESORBO,**
**TRAVIS MASTERS, AND DERRICK LAND**

**COUNT 3**
**Civil Conspiracy to steal property by a bait and switch loan**
**ALL DEFENDANTS**

**COUNT 4**
**VIOLATION OF CIVIL RIGHTS 42 U.S.C. 1983**
**AGAINST ALEX JOHNSON,**
**BLUE FUNDING, LLC, ARCHDALE FUNDING LLC,**
**1SHARPE OPPORTUNITY INTERMEDIATE TRUST,**
**1SHARPE OPPORTUNITY FUND, L.P.**
**ANDREW DESORBO, TRAVIS MASTERS, and DERRICK LAND**

**COUNT 5**
**CONSPIRACY TO VIOLATE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT (RICO)**
**ALL DEFENDANTS**

**COUNT 6**
**UNDER 18 U.S.C § 1962(c)**
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**(ALL DEFENDANTS)**

**COUNT 7**
**UNDER 18 U.S.C. § 1962(d)**
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**(ALL DEFENDANTS)**

**COUNT 8**
**UNDER 18 U.S.C. § 1962(c)**
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**[Alternative RICO Enterprise]**
**(ALL DEFENDANTS)**

**COUNT 9**
**CIVIL HARRASSMENT**
**Against all Defendants**

**COUNT 10**
**BREACH OF CONTRACT OF JULY 16, 2018**
**Green World against all Defendants, and KIM on his Guarantee**
**except Robson, 1SHARPE**

**COUNT 11**
**BREACH OF THE COVENENT OF GOOD FAITH AND FAIR DEALING**
**(The Contract of July 16, 2018)**
**Plaintiff Kim on his Guarantee against all Defendants**

**COUNT 12**
**BREACH OF THE COVENENT OF GOOD FAITH AND FAIR DEALING**
**(The Contract of July 16, 2018)**
**Against all Defendants**

**COUNT 13**
**COMMON LAW CIVIL EXTORTION**
**Against O'Brien, DeSorbo, Masters, Land, SUMMIT and BLUE Funding**

**COUNT 14**
**DECLARATORY RELIEF**
**Against all Defendants**

**COUNT 15**
**FRAUD BY MISREPRESENTATION**
**Against O'Brien, SUMMIT, DeSorbo, Masters, Land, and BLUE Funding**

**COUNT 16**
**FRAUD by BAIT AND SWITCH**
**Against O'Brien, SUMMIT, BLUE Funding,**
**DeSorbo, Masters, Land, and Archdale Funding**

**COUNT 17**
**Breach of Contract of June 6, 2018**
**Against O'Brien, SUMMIT, BLUE Funding,**
**DeSorbo, Masters, and Land**

**COUNT 18**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(The Contract of June 6, 2018)**
**Green World against O'Brien, SUMMIT, BLUE Funding,**
**DeSorbo, Masters, and Land**

**COUNT 19**
**BREACH OF THE CONTRACT**
**(The Contract of July 25, 2018)**
**Green World against O'Brien, SUMMIT, BLUE,**
**DeSorbo, Masters, and Land**

**COUNT 20**
**<u>BILLING FRAUD</u>**
**Against all Defendants INCLUDING 1SHARPE LP**

**COUNT 21**
**<u>BREACH OF FIDUCIARY DUTY</u>**
**Against all Defendants**

## JURISDICTION

1. Washington has jurisdiction over defendants by § 4.28.185. (1)(b) the commission of a fraud, entering into a contract, and conspiracy to steal property belonging to a resident of Washington.

2. Federal Court Jurisdiction over this matter is claimed under 28 USC 1331 and 42 USC 1983; by Defendants' 'Conspiracy' to Deprive Plaintiffs of their Civil Rights and property interest under color of State Authority.

3. Federal Court Jurisdiction is also claimed under 28 USC 1331, The United States Constitution Amendments 5 and 14 (The Due Process Clauses) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).

4. Federal Court Jurisdiction is also claimed under 28 USC 1331, The United States Constitution Amendment 4 (Wrongful Seizure of Property) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).

5. Federal Court Jurisdiction is also claimed under 28 USC 1331 and 18 USC 1961 et. sec. with Jurisdiction found at 18 USC 1964 Racketeer Influenced and Corrupt Organizations (RICO).

6. Federal Court Jurisdiction is also claimed under 28 USC § 1367. Supplemental jurisdiction Over Plaintiff's common law Claims against Defendants for inter alia Fraud in inducement to contract, Civil Conspiracy to steal property by a bait and switch loan, Declaratory Judgment, and to quiet title.

7. Venue is proper pursuant to 28 U.S. Code § 1391(b) (2). And (c) 1.

## PARTIES

8.  Plaintiff GREEN WORLD COUNSIL BLUFFS, LLC is a Washington Limited Liability Company organized in Washington with its resident agent located at 522 W RIVERSIDE AVE STE N, SPOKANE, WA, 99201.  At all times pertinent to this action, GREEN was the owner of the Federal Building in Council Bluffs, Iowa.

9.  Plaintiff MICHAEL KIM is an individual residing in Venice, Florida.  He is the sole member of GREEN.

10. Defendant ARCHDALE FUNDING, LLC is a Delaware Limited Liability Company created by BLUE FUNDING, LLC (hereinafter "BLUE") and its officers after BLUE was sued by GREEN in Florida for fraud and RICO claims. ARCHDALE was created as soon as BLUE was sued.  Its sole purpose was to take unlawful assignment of the MORTGAGE from BLUE while BLUE was in litigation, then quickly transfer it to 1SHARPE LP, a hedge fund based in Cayman Island and the main Defendant in this case.   ARCHDALE attempted to act as 1SHARPE LP's agent by filing a separate foreclosure action against Plaintiffs in Iowa while SUMMIT and BLUE were still in litigation in Florida.  Unfortunately for 1SHARPE LP, ARCHDALE never received a Limited Power of Attorney (LPOA) from 1SHARPE LP, but from yet another Delaware trust called 1SHARPE OPPORTUNITY INTERMEDIATE TRUST.  Not only did it lack standing to bring any action in Iowa on behalf of the MORTGAGE holder, 1SHARPE LP, but it dissolved itself and ceased to exist on June 1, 2019, well before receiving a judgment on behalf of 1SHARPE LP.  As of this Complaint filing, ARCHDALE still ceases to exist.

11. Defendant, SUMMIT AND CROWNE CAPITAL PARTNERS, LLC, ("SUMMIT") is a Delaware Limited Liability Company.  SUMMIT entered into a contract with Plaintiffs pretending to be the lender, when in fact, it was nothing more than a broker for 1SHARPE OPPORTUNITY INTERMEDIATE FUND, L.P. ("1SHARPE LP"), a Cayman Island Limited Partnership.

12. Defendant, ANTHONY O'BRIEN ("O'BRIEN") on information and belief is the Managing Partner of Defendant SUMMIT AND CROWNE CAPITAL PARTNERS, LLC.  Plaintiffs are piercing the corporate veil to sue O'BRIEN personally because of the fraudulent acts hereinafter set forth more fully below.

13. Defendant BLUE FUNDING, LLC ("BLUE"), is a Delaware Limited Liability Company, which acted as a broker for 1SHARPE LP, and also as a table funder for the loan at the closing.  When Plaintiffs discovered that BLUE was the actual funder of the loan with SUMMIT and sued BLUE, BLUE quickly created a paper company with no assets called ARCHDALE FUNDING, LLC ("ARCHDALE") in Delaware and unlawfully transferred its only asset, the MORTGAGE, to ARCHDALE.

14. Defendant CHURCHILL REAL ESTATE PARTNERS LLC ("CHURCHILL"), a Delaware LLC, used to be called BLUE CAPITAL, LLC ("BLUE CAPITAL"), before it got sued by Plaintiffs in Florida.  It changed its name to CHURCHILL, in the hopes that Plaintiffs will not figure out about its new name to bring in as a Defendant.  CHURCHILL is the mothership of BLUE and ARCHDALE, its subsidiaries.

15. Defendant 1SHARPE OPPORTUNITY INTERMEDIATE TRUST ("1SHARPE TRUST") is a Delaware trust, which gave Limited Power of Attorney  (LPOA) to ARCHDALE, to file a foreclosure action in Iowa.  Unfortunately, 1SHARPE TRUST is neither the Note holder nor the Mortgage holder.  1SHARPE TRUST's LPOA is rendered useless in any place on earth.

16. Defendant 1SHARPE OPPORTUNITY FUND, L.P. ("1SHARPE LP") is a hedge fund based in Cayman Islands, and is the main Defendant in this case.  It took Plaintiffs over two (2) years to figure out that this is the true **MOTHERSHIP** of all frauds committed by ARCHDALE, BLUE, and SUMMIT, since all of the funds and directions all came from 1SHARPE LP.

17.  Defendant ANDREW DESORBO ("DESORBO"), an individual, is a resident of North Carolina, and he is a partner of BLUE and BLUE CAPITAL as well as CHURCHILL.  His specialty is creating empty shell companies such as ARCHDALE in Delaware, so that the "MOTHERSHIP" 1SHARPE LP out of Cayman Islands do not get sued when their frauds get exposed.  In fact, after he and his partners at BLUE and CHURCHILL created ARCHDALE, and ARCHDALE took the MORTGAGE from BLUE and handed over to 1SHARPE LP in Cayman Islands, as well as filed a new lawsuit in Iowa, DESORBO was perfectly okay with dissolving ARCHDALE and let ARCHDALE cease to exist, since the paper company's use was no longer needed.  Plaintiffs are piercing the corporate veil to sue DESORBO personally because of the fraudulent acts hereinafter set forth more fully below.

18. Defendant TRAVIS MASTERS ("MASTERS"), an individual, is a resident of North Carolina, and he is a managing partner of BLUE, BLUE CAPITAL, as well as CHURCHILL.  After BLUE was sued by Plaintiffs, MASTERS conspired with DESORBO to create ARCHDALE so that BLUE can commit fraudulent conveyance while being litigated.  MASTERS hid the fact that the true funder of the loan was 1SHARPE LP, the Cayman Island entity, and BLUE never disclosed the mandatory lender and broker information on final HUD statement, so Plaintiffs could not easily find BLUE as a table funder after SUMMIT unlawfully declared default on GREEN.  Plaintiffs are piercing the corporate veil to sue MASTERS personally because of the fraudulent acts hereinafter set forth more fully below.

8

19. Defendant DERRICK LAND ("LAND"), an individual, is a resident of North Carolina, and he is a managing partner at BLUE, BLUE CAPITAL, and CHURCHILL.  In addition to conspiring with DESORBO and MASTERS to harm Plaintiffs, LAND personally committed multiple counts of perjury by making false declarations in multiple cases, especially when it came to fooling the Iowa State Court with his false statements to obtain a Summary Judgment.  Plaintiffs are piercing the corporate veil to sue MASTERS personally because of the EXTENSIVE fraudulent acts hereinafter set forth more fully below.

20. Defendant ALEX M. JOHNSON ("JOHNSON"), an individual, is a resident of Iowa, and he decided to represent both the seller of the MORTGAGE, ARCHDALE, as well as the "buyer" of the MORTGAGE, 1SHARPE TRUST.  Unfortunately for JOHNSON, 1SHARPE TRUST was never a legal owner of the MORTGAGE, since the MORTGAGE was transferred to 1SHARPE LP, the Cayman Island entity.  Although he was fully aware of the fact that ARCHDALE lacked standing since it only had an LPOA from 1SHARPE TRUST, a Delaware trust, he actively hid this important fact to commit Fraud upon the court, in order to fool the local court and unlawfully obtain the summary judgment.

21. On or about July 16, 2018, Plaintiffs and Defendants SUMMIT and O'BRIEN entered into a finance contract. The contract required Plaintiffs to make the following payments; i.e. an interest rate of 9% and payments as follows. $18,229.07, per month. Defendants also required $54,687.21 to be Paid at closing which represented and stated this sum was prepaid for August, September and October, 2018, with the next payment due on November 1, 2018.

22. Plaintiff has performed each and every covenant and condition of the agreement on his part to be performed. Except as to those terms and or conditions prevented by Defendants' willful acts.  Nevertheless, Defendant Tony O'Brien immediately began a systemic parade of tactics amounting to harassment with several phone calls and emails, threatening to take Plaintiffs' property away from them.

23. Defendants further made demands that Plaintiff stay on course to renovate a part of his Federal Courthouse to allow for a halfway house for newly released Federal inmates. General Services Administrations (GSA) notified Plaintiff on August 14th, that if he continues with the Halfway House project, they would vacate the courthouse.  They offered instead to take additional footage and a 20-year fixed lease.

24. Plaintiff advised Defendants of the GSA's new requirement immediately after the GSA conference call on August 16th.  Initially, Defendants tried to convince the Plaintiff to keep going with the Halfway House option and lose the Courthouse.  However, once the Plaintiff decided to pursue the 20-year Courthouse option, Defendants then demanded the halfway house to be established, knowing that GSA would leave the building empty and vacant, and that in that case Plaintiffs would not be able to make the mortgage payments.

25. On or about August 27, 2018, Defendants have declared a default and have raised the interest rate to 18%.

26. The issue Defendants are attempting to rely on is set forth in the Note of July 16, 2018, i.e. paragraph 3.8. which states "any representations or statement herein or any other representation or statement made or furnished to lender by maker, which was materially incorrect or misleading at the time it was made or furnished."

27. Plaintiff have not made any statement to Lender that was materially incorrect or misleading at the time if any were made.  All statements to lender were true and accurate at the time they were made.

28. Lender has taken an inaccurate position because he is clouded by his desire to own Plaintiff's Real Property.  In fact, Defendant O'Brien has stated on numerous occasions in email and phone conversations of his intent to take Plaintiff's property away from him when the loan is due on July 16th, 2019.

29. Plaintiff is informed and believes the reason Defendants are acting in an unreasonable manner is because they intend to destroy Plaintiffs GSA Lease, so he will not be able to make the mortgage payments.  This belief was enforced on August 28, 2018 when Defendant O'Brien informed Plaintiff his attorney was contacting GSA his email statement follows: "Our Counsel is contacting the GSA to discuss this situation and when they became involved. … How do you think GSA will react if they find your property is in litigation?"

30. Plaintiffs are informed and believe the true funding source was 1SHARPE OPPORTUNITY FUND, L.P. who acquires 'troubled' assets to securitize. This company is a limited partnership registered in the Cayman Islands.

31. Plaintiffs are also informed and believe this loan was intentionally made as a means of stealing Plaintiffs Courthouse; accordingly, it was a concealed loan to own.


## FACTUAL BACKGROUND

32. On July 16, 2018, SUMMIT & CROWNE CAPITAL PARTNERS LLC (hereinafter "SUMMIT") created and delivered a Promissory Note to GREEN in the principal amount of $2,430,543 ("the Note") with payments and interest according to its terms of the Promissory Note.

33. On that same day, SUMMIT attempted to assign the loan package to BLUE, but SUMMIT made a critical error.  SUMMIT had separated out the Mortgage and the $2,430,543 Note in the loan package and only gave BLUE the "Mortgage" paperwork.  A Note is evidence of the debt; the Mortgage is the collateral.  SUMMIT had only transferred the collateral, but never the evidence of the debt!  Significantly, SUMMIT's assignment to BLUE was without the consideration required by UCC § 3-303 (2).

34. BLUE created the Delaware LLC called ARCHDALE FUNDING, LLC, on September 28, 2018, right after getting sued in Florida by the Plaintiffs on September 28, 2018.

35.  ARCHDALE FUNDING, LLC, and BLUE FUNDINF, LLC have the identical members in each.

36. Four (4) days later, ARCHDALE entered into an Asset Management Agreement (AMA) with 1SHARPE OPPORTUNITY FUND, L.P. ("1SHARPE LP"), a Cayman Island Limited Partnership.  Plaintiffs want to make clear to this Court that 1SHARPE LP and 1SHARPE OPPORTUNITY INTERMEDIATE TRUST ("1SHARPE TRUST"), a Delaware Trust, are separate entities.

37. Upon information and belief, on or about November 1, 2018, BLUE assigned the Mortgage to ARCHDALE, again without consideration as required by UCC § 3-303 (2).  This assignment was illegal because the assignment was done for the specific purpose of transferring the loan package out of the Florida Court, where the mortgage loan was the focus of a lawsuit brought in Florida by GREEN / KIM against SUMMIT, BLUE, and others.  Again, BLUE could assign ONLY the mortgage to ARCHDALE, since the Note had been separated from the loan package by Summit when it assigned the mortgage to BLUE.

38. On November 15, 2018, ARCHDALE assigned the Mortgage to 1SHARPE LP, a Hedge Fund located in the Cayman Islands.  Its General Partners, Managers, Trustees, and Directors are 1SHARPE CAPITAL GP LLC, recorded on December 21, 2018.  Again, ARCHDALE could assign ONLY the mortgage to 1SHARPE LP, because the Note had been separated from the loan package by SUMMIT when it assigned the mortgage to BLUE, which assigned only the mortgage to ARCHDALE.

39. On February 11, 2019, 1SHARPE TRUST gave ARCHDALE a Limited Power of Attorney (LPOA).  Significantly, 1SHARPE TRUST was not the party to which ARCHDALE had tried to assign the loan package.  Consequently, this LPOA did not, in any way, grant ARCHDALE the right to act on behalf of 1SHARPE LP.

40. ARCHDALE asserted the foreclosure action, Case No.: EQCV118875, against GREEN / KIM, based on its representations that it had the authority to bring the action for the Holder of the loan package, 1SHARPE LP.  It did not, since ARCHDALE did not produce an LPOA from 1SHARPE LP.  ARCHDALE's foreclosure action was based on series of untruths including ARCHDALE's and its attorney's knowledge that the assignments were deficient and that 1SHARPE LP was not assigned the Note.

41.  "The Note and Mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the Note carries the Mortgage with it, while an assignment of the latter alone, is a nullity." Carpenter v. Logan, 83 U.S. 271 (1872).  This is brass tacks when it comes to standing.  The Mortgage follows the Note.  The Mortgage is incidental to the debt, i.e., the security follows the debt, not the other way around.  The transfers by assignment were all a nullity because the Note was never included in the assignment.

42. ARCHDALE, through its Counsel, ALEX JOHNSON convinced the lower court to issue a judgment in its favor despite knowing that it did not have the authority to assert the underlying lawsuit.  This is pure and unadulterated deception, for which ARCHDALE should be punished.


**BLUE HAD NO RIGHT TO DECLARE GREEN IN DEFAULT, AND
ARCHDALE HAD NO RIGHT TO ACCELERATE PAYMENT OF THE NOTE**

43. On or about Dec 13, 2018 BLUE informed GREEN that it was in default of the loan package.  That declaration of default was invalid because BLUE was no longer the Holder of either the Mortgage or the $2,430,543 Note.

44. ARCHDALE (in its Motion for Summary Judgment) alleged that it mailed a Notice of Acceleration of Balance Due to GREEN on January 9, 2019

45.  Derrick Land in his Affidavit (supporting ARCHDALE's motion of summary judgment) alleged, "On November 15, 2018, the Mortgage and $2,430,543 Note were subsequently assigned from ARCHDALE to 1SHARPE Opportunity Intermediate Trust, LLC ("1SHARPE TRUST"), and the assignment was recorded in the office of the Pottawattamie County, Iowa Recorder on December 21, 2018 in File No. 2018-16320".

46.  ARCHDALE's Counsel further testified in his affidavit that subsequent to the November 15, 2018 assignment, ARCHDALE and 1SHARPE TRUST entered into a Limited Power Of Attorney agreement, whereby 1SHARPE TRUST as title holder of the Note and Mortgage appointed ARCHDALE as its Attorney-In-Fact for purposes of foreclosing on the property subject to the Note and Mortgage.

47. Unfortunately for ARCHDALE, the Notice of Acceleration was not from the proper party and violated Iowa Law and the Mortgage Agreement.

48. ARCHDALE knowingly deceived the lower court when it alleged that ARCHDALE had transferred the loan package to 1SHARPE TRUST when it knew that the actual transferee was 1SHARPE LP, a Cayman Island Hedge Fund.  It further deceived the Court when it asserted that BLUE had the right to declare GREEN in default, and ARCHDALE had the right to accelerate payment of the Note.  Upon information and belief, ARCHDALE and LAND did this to keep 1SHARPE LP's name out of the matter since it has $1.0 billion invested in its Hedge Fund.  No justification washes clean such blatant deception.

49. Because no one legally entitled to declare a default or legally authorized to accelerate the Note, or in fact had any standing to foreclose, Judge Davidson lacked subject matter jurisdiction over the litigation since the default and acceleration had never been perfected and ARCHDALE lacked standing.  ARCHDALE and its Counsel used sleight of hand and remained silent to get a judgment to which they were not legally entitled to.

50. The property at issue in both this action and the prior foreclosure action is legally described as:

Parcel 1
Lots 1 to 5, inclusive, Block 6 in Bayliss First Addition to the City of Council Bluffs, Pottawattamie County, Iowa. AND

Parcel 2
That part of the West one-half of Lot 13, Block 6, Bayliss First Addition to the City of Council Bluffs, Pottawattamie, County, Iowa, particularly described as follows:
Beginning at a monument set on the North line of First Avenue, distant 204 feet, more or less, East from the intersection of the north line of First Avenue with the east line of South Seventh Street; said point of beginning being the southwest corner of Lot 13 and the southeast corner of Lot 12 in said Block 6; running thence North 10 degrees 59 minutes 02 seconds East along the easterly boundary of Lot 12 a distance of 132.00 feet to a point; thence South 74 degrees 54 minutes 03 seconds East a distance of 1.61 feet to a point; thence North 10 degrees 50 minutes 13 seconds East a distance of 60.43 feet to a monument set on the south line of an alley 16 feet wide; thence South 78 degrees 31 minutes 00 seconds East along the south line of said alley a distance of 23.63 feet to a point, being the northwest corner of land hereinafter described as Parcel 2; thence South 10 degrees 59 minutes 02 seconds West along the westerly boundary of Parcel 2 a distance of 192.36 feet to a point on the north line of First Avenue; thence North 78 degrees 27 minutes 00 seconds West along the north line of First Avenue a distance of 25.1 0 feet to the point or place of beginning. AND

Parcel 3
The East one-half of Lot 13 and a part of Lot 14 in Block 6, Bayliss First Addition to the City of Council Bluffs, Pottawattamie County, Iowa, particularly described as follows:
Beginning at a point on the north line of First Avenue, said point being the southeast corner of land hereinbefore described as Parcel 1; running thence North 10 degrees 59 minutes 02 seconds East along the easterly boundary of Parcel 1 a distance of 192.36 feet to a point on the south line of an alley 16 feet wide, said point being the northeast corner of Parcel l; thence South 78 degrees 31 minutes 00 seconds East along the south line of said alley a distance of 33.4 feet, more or less, to a point, being the northwest corner of land hereinafter described as Parcel 3, said point being distant 8 feet 4 inches East of the northwest corner of Lot 14 to Block 6; thence South 11 degrees 34 minutes 49 seconds West along the westerly boundary of Parcel 3 a distance of 192.38 feet to a point on the north line of First Avenue, said point being distant 4 feet 4 inches East of the southwest corner of Lot 14; thence North 78 degrees 27 minutes 00 seconds West along the north line of First Avenue a distance of 29.4 feet, more or less, to the point or place of beginning.

Parcel 4
That part of Lot 14 in Block 6, Bayliss First Addition to the City of Council Bluffs, Pottawattamie County, Iowa, particularly described as follows:
Beginning at a point on the north line of First Avenue and the south line of
Lot 14 in Block 6, distant 4 feet 4 inches East of the southwest corner of Lot 14, said point also being the southeast corner of land hereinbefore described as Parcel 2; running thence North 11 degrees 34 minutes 49 seconds East along the easterly boundary of Parcel 2 a distance of 192.3 8 feet to a point on the south line of an alley 16 feet wide, and the north line of said Lot 14, which point is distant 8 feet 4 inches East of the northwest corner of Lot 14; thence South 78 degrees 31 minutes 00 seconds East along the south line of said alley a distance of 41.87 feet to a monument set at the northeast corner of Lot 14, and the northwest corner of Lot 15 in Block 6; thence South 10 degrees 59 minutes 00 seconds West along the westerly boundary of Lot 15 a distance of 192.45 feet to a monument set on the north line of First Avenue, and at the southeast corner of Lot 14; thence North 78 degrees 27 minutes 00 seconds West along the north line of First Avenue and the south line of Lot 14 a distance of 45.87 feet to the point or place of beginning.

Property commonly known as: 8th South 6th Street, Council Bluffs, Iowa 51501.

## COUNT 1
## ARCHDALE LACKED STANDING AS A PLAINTIFF
## AND THE STATE JUDGMENT IS VOID FOR
## LACK OF SUBJECT MATTER JURISDICTION

51. Plaintiffs repeat, reallege and incorporate paragraphs 1-50 as though fully set forth hereat.

52. ARCHDALE was never authorized to commence the foreclosure action against GREEN and lacked legal standing to bring on the foreclosure.

53. IOWA courts determine Standing to sue: "has been defined to mean that a party must have a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." Citizens for Responsible Choices v. City of Shenandoah, 686 N.W.2d 470, 475 (Iowa 2004) (citations omitted).

54. In Schott V Schott No 110/ 07-0610 (2008) The IOWA supreme court held, a lack of standing is equivalent to a lack of subject matter Jurisdiction

55. Archdale lacked standing to be a plaintiff in the state foreclosure action because the real party did not give him a power of attorney to act in the place and steed of 1SHARPE LP

56. 1SHARPE Trust was an interloper and was never involved in any assignments.

57. ARCHDALE never had an assignment of the Note the evidence of the debt.

58.  The Judgment in the State Court is void as a matter of law.


## COUNT 2
## FRAUDULENT INDUCEMENT TO ENTER INTO CONTRACT
## (SUMMIT, O'BRIEN, BLUE, DESORBO, MASTERS, AND LAND)

59. Plaintiffs repeat, reallege and incorporate paragraphs 1-58 as though set forth hereat in full.

60. On or about July 16, 2018, Defendants represented to Plaintiffs that they would loan them money to pay off Plaintiffs existing debt on the property and fund 70% of the ARV (After Repair Value) appraised value in order for Plaintiffs to remodel the building and have some capital reserve.

61. Plaintiffs' and Defendants' entered into two valid contracts. The first contract was for a Loan Agreement against real property, and the second was for a Personal Guarantee for that loan from Plaintiff Michael Kim.

62. Both Plaintiffs performed as agreed.

63. Plaintiffs relied on Defendants representation regarding the loan and the amount and percent of the appraised value Defendants would provide upon funding

64. Defendants agreed to fund 70% of the appraised value (ARV).

65. The appraised ARV value was $5,640,000.

66. When they had plaintiffs signed for the loan, they switched the terms to a loan-to-own and refused to honor the terms by which they induced Plaintiffs to borrow the money. Defendants raised the interest rate from 7.49% to 9.0%.  In addition, instead of honoring the 1% loan origination fee, Defendant raised it to 2% right before closing.

67. Defendants have breached those agreements by declaring a default when the property was not in default and by accelerating the interest to the default rate of 18% when the property was not in default, and they had no right to increase said interest from the agreed contract rate of 9%, nor demand additional Prepaid Interest payment for another 3 months up front.

68. Defendants' Breach was a material breach, as they changed the terms of the agreement raising the interest rate to 18% and declared a default while the contract was in good standing and Plaintiffs had fully performed.

69.   Defendants material breach is significant enough to excuse both Plaintiffs from fulfilling their part of the contract.

70. Plaintiffs' have notified defendants of the breach and they have failed and refused to rectify it.

## COUNT 3
### Civil Conspiracy to Steal Property with a Bait-and-switch Loan
### (ALL DEFENDANTS)

71. Plaintiffs repeat, reallege and incorporate paragraphs 1-70 as though the same are set forth hereat in full.

72. Plaintiffs are informed and believe and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

73. On or about August 27, 2018, Defendants and each of them knowingly and willfully conspired and agreed among themselves to steal Plaintiffs courthouse in order for 1SHARPE LP to securitize it.

74. SUMMIT, still pretending to be the lender, declared default on GREEN and immediately raised the interest to 18%, when in fact GREEN had already prepaid three (3) months interest up front at the closing.

75. Defendants and each of them did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

76. Defendants and each of them, furthered the conspiracy by cooperation with each other or, lent aid and encouragement to each other, or ratified and adopted the acts of each of the other defendants.

77. As a proximate result of the wrongful acts herein alleged plaintiffs have been generally damaged in the sum of $5,000,000, without considering emotional distress damages and exemplary damages.

78. After ARCHDALE filed a petition to foreclose without even having standing to appear in the Iowa Court, Defendants quickly moved for receivership in place to deprive Plaintiffs of any cash flow to keep litigating in both Florida and now Iowa.

79. The loss of income mounted to at least $247,500 annually for the last 2 years, while the value of the property was negatively impacted with the news of pending foreclosure.

80. Defendants are also directly responsible for loss of the enjoyment of life for KIM, as KIM had to use his personal funds to keep both litigations going, while losing valuable time away from family, even on weekends.

81. Defendants did the things herein alleged maliciously and to oppress plaintiffs. Plaintiffs are therefore entitled to exemplary or punitive damages in the sum of $15,000,000.

82. This conspiracy involves an agreement between two or more parties; To do an unlawful act or do a lawful act by unlawful means; and includes the performance an overt act in pursuance of the conspiracy; and as a direct result plaintiffs' have suffered damage as a result of the acts performed through the conspiracy.

## COUNT 4
## VIOLATION OF CIVIL RIGHTS 42 U.S.C. 1983
## (AGAINST JOHNSON, BLUE, ARCHDALE, 1SHARPE TRUST, 1SHARPE LP, DESORBO, MASTERS, and LAND)

,

83. Plaintiffs repeat, reallege and incorporate paragraphs 35-82 as though the same are set forth in full hereat.

84. Defendant ARCHDALE, through its Counsel, ALEX JOHNSON convinced Judge Davidson to issue a judgment in its favor despite knowing that it did not have the authority to assert the underlying lawsuit.

85. Defendant ARCHDALE, through its Counsel, ALEX JOHNSON convinced Judge Davidson that ARCHDALE was provided a POA that allowed it to conduct the foreclosure on behalf of 1SHARPE Trust.

86. Defendant ARCHDALE, through its Counsel, JOHNSON, convinced Judge Davidson that the interest rate that exceeded the maximum interest allowed under IA law was permissible.

87. All of the acts as stated herein were engaged in, by and through Judge Davidson an agent of the State of IA. In his official capacity of a Judge of the IA courts.

88. Judge Davidson was a willing participant and co-conspirator, however as he was duped into aiding the conspiracy, we are not suing Judge Davidson

89. United States law allows an individual who believes that his or her constitutional rights have been violated to bring a civil action against the government to recover the damages sustained as a result of that violation. Specifically, 42 USC §1983 "provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by any person acting under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory."  Gomez v Toledo, 446 US 635, 638 (1980).

90. In Gomez, the United States Supreme Court determined that only two elements must be pled to properly assert a cause of action under 42 USC §1983. First, the Plaintiff must specifically identify the constitutional right of which he or she was deprived. Id. at 640. Second, the Plaintiff must assert that "the person who deprived him of that federal right acted under color of state or territorial law." Id.

91. In other words, the individual who deprived the Plaintiff of the right must have been acting for or on behalf of a governmental entity at the time the right was denied. However, an agent of the government who is abusing his position or the power conferred upon him is still acting under the "color of law" and is thus subject to §1983 actions. Monroe v Pape, 365 US 167, 172 (1960).  There is no constitutional violation if the individual who denied the Plaintiff's right as a private citizen unless that individual was working in conjunction with a governmental entity.

92. 42 USC §1983 is merely a gateway, the potential for the types of claims brought under it varies widely. The statute is often used to assert claims of police misconduct, including violations of the Fourth Amendment's prohibition on illegal search and seizure. Other applications include violations of the First Amendment, and the Due Process and Equal Protection Fifth and Fourteenth Amendments. Plaintiff claims two abridgments of his rights under the 4th amendment unlawful seizure and the 5th and 14th Amendment failure to provide due process and equal protection.

20

93. This Court has jurisdiction over the defendants and each of them, because as evidence shows, they clearly aided each other in a conspiracy with the unnamed judge, to deliberately and consciously deny Plaintiff any element of procedural due process required by Amendment 5, and 14, by holding a trial over which they knew they lacked the required subject matter jurisdiction, and they knew ARCHDALE lacked standing to foreclose. They also knew ARCHDALE was not in lawful possession of the evidence of the debt.

94. Defendants also denied Plaintiffs the equal protection of the law required by amendment 14, and actually unlawfully, illegitimately, dishonestly and with criminal intent seized GREEN'S Courthouse and turned it over to ARCHDALE and LAND in violation of Amendment 4. ARCHDALE was not a lawful lien or judgment holder.

95. All the named defendants and the unnamed judge accomplished this first by holding a trial in the state court knowing Judge DAVIDSON Lacked subject matter jurisdiction over the foreclosure of the property. Then knowing the State Court Judgment was void as a matter of law because they knew the State court lacked subject matter jurisdiction over the foreclosure because No party had standing to assert the role as plaintiff. In the furtherance of their open conspiracy agreed to also sell GREEN's COURTHOUSE thus intending to complete their theft of this valuable property, all under color of State law and State authority.

96. A judgment where the court lacked jurisdiction over the subject matter is void and a nullity and conveys no interest in the property. All of these defendants and the unnamed judge communicated among themselves and acted under color of state law,

97. 42 USC 1983 provides as follows: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

98. Courts have determined that the "under color of" clause requires that the wrongdoer qualify, at least in some sense, as a representative of the state when depriving the victim of civil rights. In a nutshell, the clause refers to people who misuse some kind of authority that they get from state law.  This covers all of the defendants and especially Judge Davidson who lacking Jurisdiction over the subject matter of the ARCHDALE FORECLOSURE insisted on maintaining the case and rendering the property foreclosed.  A state court judge is a representative of the state.

99. Acts under "color of any law" include acts not only done by federal, state, or local officials within the bounds or limits of their lawful authority, but also acts done without and beyond the bounds of their lawful authority; provided that, in order for unlawful acts of any official to be done under "color of any law," the unlawful acts must be done while such official is purporting or pretending to act in the performance of his/her official duties. This definition includes, individuals who act with them and covers each and every named defendant as well as the unnamed judge Davidson.

100.  Defendants knew ARCHDALE lacked standing to bring the foreclosure complaint on before the IA court, they knew ARCHDALE has assigned the Mortgage to 1Shart LP, they knew the POA from 1SHARPE Trust was from no actual party that had any assignment of any interest in the case, in fact JOHNSON knew LAND had committed perjury by his affidavit.

101. "a void judgment, order or decree may be attacked at any time or in any court,

102. either directly or collaterally" - The law is well-settled that a void order or judgment is void even before reversal.  Vallely v Northern Fire & Marine Ins. Co., 254 U.S. 348, 41 S.Ct. 116 (1920). "It is clear and well-established law that a void order can be challenged in any court."  Old Wayne Mut. L. Assoc. v McDonough, 204 U.S. 8, 27 S.Ct. 236 (1907). Davidson's Order turning GREEN and KIM's property over to ARCHDALE and LAND is also void.

103. "Jurisdiction, once challenged, is to be proven, not by the court, but by the party attempting to assert jurisdiction. The burden of proof of jurisdiction lies with the asserter." See McNutt v. GMAC, 298 US 178. The origins of this doctrine of law may be found in Maxfield's Lessee v. Levy, 4 US 308; Hagens v. Lavine, 415 U.S. 533

104. Plaintiffs are entitled to all damages stemming from defendant's deliberate violation of their right to procedural due process.


105. The Court in GREAT WESTERN MINING & MINERAL COMPANY v. Fox Rothschild LLP; (C A Third Circuit August 5, 2010) 615 F.3d 159 * | 2010 U.S. App. LEXIS 16210 **, held the Rooker-Feldman was not appropriate where the state court was involved in a conspiracy to predetermine the outcome of a trial in the state court proceeding.

106. In Great Western, the assignee alleged the conspiracy resulted in the state court decisions being predetermined, violating due process. The claim did not assert injury caused by those judgments or seek their review. Such a conspiracy would itself violate due process, independently of the later state court decisions, thus, the Rooker-Feldman doctrine did not apply to deprive the district court of jurisdiction.

107.  In Great Western, HN20 Damages, General Damages; Plaintiff who are denied due

process can recover mental or emotional distress damages or nominal damages. Because the

right to procedural due process is absolute in the sense that it does not depend upon the

merits of a claimant's substantive assertions, and because of the importance to organized

society that procedural due process be observed, the denial of procedural due process should

be actionable for nominal damages without proof of actual injury.

108.  Plaintiffs seek actual damages of $5,000,000 and General damages of $15,000,000 and

exemplary damages 3X their actual and general damages $60,000,000.


### COUNT 5
### CONSPIRACY TO VIOLATE RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS ACT (RICO)
### (ALL DEFENDANTS)

109.  Plaintiffs repeat, reallege and incorporate paragraphs 1-108 as though the same are fully

set forth herein.

110.  JURISDICTION AND VENUE: This Court has subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper pursuant to 18 U.S.C. § 1964 and

1965, which allows for nationwide jurisdiction pursuant to the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Venue is proper under 18

U.S.C. §1965.

111.  Declaratory relief under 28 USC 2201 and §2202 is also available under 18 USC § 1964a.

112.  This is a civil action for violating 18 U.S.C. § 1961 et. Seq. Racketeer influenced and

corrupt organization act (RICO).  RICO addresses the corrupt abuse and misuse – usually

covertly – of organizations, entities, businesses, institutions or even government or

government agencies such that superficially legitimate entities operate for Criminal

Purposes irrelevant to the entity's purpose.

113.  Plaintiffs sue defendants as individuals and entities for operating a criminal enterprise, for violating Plaintiffs due process rights, vested property Rights, Constitutional Rights, and for misappropriating their property for financial gain. GREEN and KIM's Real Property. The Defendants including without limitation 1SHARPE LP, have over the past two (2) and more years conducted a corrupt enterprise in violation of the racketeering influence and corrupt organizations act, all of which is continuing in nature.  As grounds therefore, Plaintiff alleges as follows:

114.  These damages are continuing and subject to change once the full extent of the fraud is uncovered in discovery.

115.  The ongoing conspiracy is to steal GREEN and KIM's property for 1SHARPE LP to make a profit by securitizing it and selling off the shares. This is not the first property 1SHARPE has stolen in this manner and it is not the only entity they have set up for this purpose.

**COUNT 6**
**UNDER 18 U.S.C § 1962(c)**
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**(ALL DEFENDANTS)**

116.  Plaintiffs repeat, reallege and incorporate by reference the foregoing paragraphs of the Complaint as though fully set forth herein.

117.  GREEN and KIM are a "person" as defined by 18 U.S.C. §§ 1964(c) and 1961(3).

118.  Defendants ALEX JOHNSON, SUMMIT AND CROWNE CAPITAL PARTNERS, LLC, ANTHONY O'BRIEN, BLUE FUNDING, LLC, BLUE CAPITAL, LLC, ARCHDALE FUNDING LLC, 1SHARPE OPPORTUNITY INTERMEDIATE TRUST, 1SHARPE OPPORTUNITY FUND, L.P., ANDREW DESORBO, TRAVIS MASTERS, and DERRICK LAND, are natural persons and corporate entities and are "persons" as defined by 18 U.S.C. §§ 1961 (3) and 1962 (c).

## THE ENTERPRISE

119.  Defendants ALEX JOHNSON, SUMMIT AND CROWNE CAPITAL PARTNERS, LLC,

ANTHONY O'BRIEN, BLUE FUNDING, LLC, BLUE CAPITAL, LLC, ARCHDALE

FUNDING LLC, 1SHARPE OPPORTUNITY INTERMEDIATE TRUST,  all led and

managed by 1SHARPE OPPORTUNITY FUND, L.P., ANDREW DESORBO, TRAVIS

MASTERS, and DERRICK LAND form an enterprise (the "Enterprise") They each also

have a legitimate business structure apart from the criminal enterprise which enables them to

draw in unsuspecting parties. They act as valid lenders.

120.  The defendants concealed their relationship with 1SHARPE LP and Derrick Land in order
to aid the conspiracy in the theft of GREEN and KIM's property.

121.  Defendants have formed an association-in-fact enterprise. An association-in-fact enterprise
may be a group of individuals, or a group of corporations, or a group that includes both
individuals and legal entities. Philip Morris USA, Inc., 566 F.3d at 1111.

122.  A plaintiff may plead more than one enterprise.  Pleading alternative enterprises "does not
undermine the plausibility of the pleadings."  Jackson v. Segwick Claims Mgmt. Serv., Inc.,
699 F.3d 466, 480 (6th Cir. 2012).  "If a party makes alternative statements, the pleading is
sufficient if any one of them is sufficient."  Id.

123.  The Enterprise does not appear to have a hierarchical structure or a chain of command. In

Bolye, the Supreme Court resolved and clarified the characteristics of an actionable

association-in-fact enterprise. The Supreme Court stated that an association-in-fact

enterprise possesses three characteristics: (1) a purpose, (2) relationships among those

associated with the enterprise, and (3) longevity sufficient to permit these associates to

pursue the enterprise's purpose. The Supreme Court further explained:

124.  "Such a group need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach".

125.  The enterprise and the defendants have longevity, 1SHARPE LP has been engaging in this type of fraud in excess of 5 years, ANDREW DESORBO, TRAVIS MASTERS, and DERRICK LAND and in excess of at least 5 years the attorney ALEX JOHNSON also in excess of 5 years.  By all accounts they will continue their fraud schemes as they appear to be financially rewarding for them and thus far, they have been able to get away with them.

126. Each Defendant is employed by or associated with the Enterprise. These individuals and entities thus operate as an association in fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  They determined and conspired together, in this case, to use the enterprise to steal a valuable piece of real estate from GREEN and KIM.

127.  The purpose of the Enterprise is to defraud property owners by profiting off of "a Loan scam" they make loans with a secret view to stealing the property in a manner that is illegal and fraudulent. This is accomplished by (1) the 1SHARPE LP Association and Defendants associated therewith soliciting consumers for "loans" (2) the 1SHARPE LP Association coordinating and drafting fraudulent loans declaring defaults and demanding payments not

even due to extort payments from them (3) the 1SHARPE Association using Extortion and Bribery to accomplish their goals. The enterprise participants are related and the enterprise is longstanding and ongoing in pursuit of such common purpose. Such participants act together for a common purpose and function as a continuing Unit. They also use the United States and or State Courts to aid in the theft of a victim's property by converting valuable estates to liquidate the property and divide the spoils among the members of the enterprise.

128.  Each person is related to the enterprise and has a role.  Plaintiffs are informed and believe 1SHARPE LP is the financial source of the funds, they loan the money at a low ration to asset value, with the ultimate view to owning the asset. Loans made by others but funded by them Everyone receives some profit from the enterprise.

129.  Further evidence of the conspiracy is Summit's concealment of the real lender.

130.  From on or about May 1, 2018 to the present, the Enterprise has been engaged in and continue to be engaged in activities that affect Interstate commerce. This is apparent by the criminal conduct they engage in Extortion, and Bribery via the US mail and the internet, which are activities that impact interstate commerce.

131.  1SHARPE LP in particular controls property from multiple states during the loan and foreclosures processes.

132.  A RICO claim must be predicated upon underlying acts of racketeering. When a RICO claim is based upon violations of federal criminal statutes see 18 U.S.C. § 1961(1)(B)), of title 18, United States Code:  Section 201 (relating to bribery) section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) section 1512 (relating to tampering with a witness, victim, or an informant) section 1952 (relating to racketeering) any offense involving fraud connected with a case under title 11;  Plaintiff alleges that Defendants have violated one or more of the foregoing, the nexus with interstate commerce is necessarily established by the commission of the underlying federal crime. See United States v. Urban,

404 F.3d 754, 767 (3d Cir. 2005) (stating that the government / plaintiff "need only prove that Hobbs Act extortion potentially affected interstate commerce"). Moreover, because the U.S. Constitution confers the postal powers upon the federal government, acts of mail fraud, even intrastate use of the mails, have an inherent nexus with interstate commerce. United States v. Elliott, 89 F.3d 1360 (8th Cir. 1996). Because violations of the mail fraud statute are almost always alleged in a RICO. So do internet crimes of extortion. Using emails to extort or bribe. Defendants, especially Summit and ANTHONY O'BRIEN used the internet and US postal service for his extortion attempt to force GREEN and KIM to make payments not even due at the time.

133.  A RICO claim has also been defined as fraudulent Billing by an attorney, where the fraudulent bills are sent through the U.S. mails and now includes provided a client by wire, internet. This includes Alex Johnson and Land.

134.  Law firm overbilling – which includes Alex Johnson, which they applied against GREEN and KIM whether described as the euphemistic "bill padding" or simply "billing fraud" - is a serious problem that is seldom discussed and even less frequently addressed. But rare is the legal bill that does not include at least some "padding." In fact, according to the California State Bar, most bills are inflated at least 10-30 percent. Sufficient to support a RICO claim.

135.  Here in particular we have violations of criminal acts, as well as violations of Federal law dealing with procedural due process, the theft of an estate involving an intentionally duped judge.  KIM and GREEN have been damaged by 1SHARPE LP and each of the participants in this RICO enterprise and the other defendants predicate acts as set forth herein.

136.  Pattern of Racketeering Activity – Mail and Wire Fraud

137.  Defendants conducted and participated in, directly and indirectly, the Enterprise affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5).

138. Defendants devised a scheme and artifice to defraud, and obtain Money or property by means of false or fraudulent pretenses, representations and promises in the ways described more fully above and including:

   a. By aggressive marketing techniques to obtain consumer-clients

   b. By a web site presence

   c. Through the US mail and email wire communications

   d. Forging documents for use at any trial

   e. Setting up multiple companies to transfer their security agreements away from any trial.

   f. Concealing evidence or spoliation of evidence

   g. Using the courts to aid in their theft

   h. Causing the US Postal service mails and interstate wires or other private or commercial carriers to be used for the purpose of extortion

   i. Using Judges whom they pay or who they dupe to protect them through court and or bankruptcy proceedings where the true facts are concealed from the Judge

   j. The pattern of the enterprise is the same, a loan with a low ratio to value, generally a bait and switch loan at the last minute to ensure the Victim must take the loan, payment in front some periodic payments to one of the RICO participants.

   k. There are other such cases currently on going involving this RICO racket and one or more of these defendants.

   l. Defendants complete its extortion by the U.S. mail.

   m. Each of the hundreds of uses of the mails and interstate wires made in connection with Defendants' fraudulent scheme, spanning a period of no fewer than four (4) years, constitutes a separate instance of mail and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343 and taken together, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

139.  Defendants knew the interstate mail and interstate wires were utilized in furtherance of the fraudulent scheme, and it is foreseeable that the mails and interstate wires would be used. In connection with Defendants' fraudulent scheme, the acts of racketeering activity is related and occurred over a substantial period of time within as few as a year of each other and ten (10) years of each other. The racketeering acts are an ongoing part of Defendants' regular way of doing business. The predicate acts are ongoing and will be repeated. It is anticipated that 1SHARPE LP, and Land, O'Brien and the others will continue their profitable scheme.

140.  As a direct and proximate result of these RICO violations, KIM and Green. were injured within the meaning of 18 U.S.C. § 1964(c). in the theft of their real property

141.  By reason of Defendants violations described above, KIM and GREEN are entitled to recover compensatory and treble damages in an amount to be determined at trial, in accordance with 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorney's fees plus when allowed exemplary damages.

<u>Relationship of Pattern of Racketeering Activity to Enterprise</u>

142.  The pattern of racketeering activity described above is integral to Defendants' fraudulent scheme. Without engaging in mail and wire fraud, Defendants' would be unable to offer their fraudulent loan to own scheme to consumers and would be unable to transmit the fraudulent dispute correspondence in the manner that they do.

143.  Defendants' conduct involves and continues to pose a threat of long-term criminality and has continued to the present.

144.  Each Defendant operates and manages the Enterprise's affairs as described above. Each defendant intended to engage in the predicate acts with intent to defraud, with knowledge that such acts were wrongful and illegal, and with the intent and actual harm cause to KIM and GREEN through their corrupt activities which amount to theft.

## COUNT 7
## UNDER 18 U.S.C. § 1962(d)
### Racketeer Influenced and Corrupt Organizations Act ("RICO")
### (ALL DEFENDANTS)

145.  KIM and GREEN repeat, reallege and incorporate by reference the foregoing paragraphs of the Complaint as though fully set forth hereat.

146.  KIM and GREEN are "persons" as defined by 18 U.S.C. §§ 1964(c) and 1961(3).

147.  Defendants are "persons" as defined by 18 U.S.C. §§1961(3) and 1962(d).

148.  As described above defendants are an association in fact within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which Enterprise has, at all relevant times, been engaged in activities that are in and affect interstate commerce in carrying out the fraudulent loan and foreclosure schemes.

149.  Each Defendant has unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate the provisions of 18 U.S.C. § 1964(c), including numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. § 1962(d). Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in the furtherance of the fraudulent scheme, including the acts of racketeering set forth above and which have damaged and injured GREEN and KIM in the theft of their valuable property.

150.  The Defendants took overt acts in furtherance of the scheme and to conceal the existence of the scheme from KIM and GREEN and others, as set forth above, in order to control the theft of GREEN's estate.

151.  By reason of the violation of 18 U.S.C. § 1964(d) committed by Defendants, KIM and Green were injured within the meaning of 18 U.S.C. § 1964(c), the full extent of which will be determined at the jury trial.

152.  By reason of Defendants' violations described above, KIM and GREEN are entitled to three times their actual damages in accordance with 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

**COUNT 8**
**UNDER 18 U.S.C. § 1962(c)**
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**[Alternative RICO Enterprise]**
**(ALL DEFENDANTS)**

153.  Plaintiff repeat and incorporate by reference the foregoing paragraphs of the Complaint as though fully set forth hereat.

154.  KIM and GREEN are "persons" as defined by 18 U.S.C. §§ 1964(c) and 1961(3).

155.  Defendants are "persons" as defined by 18 U.S.C. §§1961(3) and 1962(d).

156.  ANDREW DESORBO, TRAVIS MASTERS, ANTHONY O'BRIEN and DERRICK LAND are an enterprise (the alternative enterprise) within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Defendants operate and manage the alternative enterprise affairs, and each defendant is associated with the alternative enterprise.

157.  Evidence of this enterprise has been discussed above. This enterprise is ongoing as evidenced by ANTHONY O'BRIEN concealment of his relationship with ANDREW DESORBO, TRAVIS MASTERS, 1SHARPE LP, and DERRICK LAND.

158.  Plaintiff has been damaged in excess of $5.000,000.

159.  Plaintiff is entitled to treble damages under RICO.

160.  Defendants have committed at least two (2) predicate acts consisting of Extortion, Fraud in making a bait-and-switch loan and a loan-to-own Plaintiff's Courthouse.  They have set up multiple entities without capitalization in order to transfer their notes and Mortgages by fraudulent conveyances to ARCHDALE FUNDING LLC who had No capitalization for the purpose of concealing they are in litigation based on their having made a fraudulent loan.

161. Defendants are still involved in the enterprise and still creating entities with the same principles and without capitalization for the same purpose.  Defendants' enterprise was established for the purpose of committing fraud, in their loan origination and their agreements.

162. Defendants during this prior litigation fraudulently transferred their only asset, GREEN's Mortgage but failed to transfer the note to ARCHDALE FUNDING LLC, who thereafter transferred it to Defendant 1SHARPE, for the purpose of foreclosing on Plaintiff's courthouse, leaving them without the ability to respond in damages.

## ADDITIONAL FACTS

163. Plaintiffs at the time of this loan was informed and believed that the actual lender was SUMMIT AND CROWNE CAPITAL PARTNERS, LLC (SUMMIT) and ANTHONY O'BRIEN (O'BRIEN), Plaintiff was informed as such directly by SUMMIT and O'BRIEN.

164. Plaintiffs through their private investigations discovered the true identity of the table lender, BLUE FUNDING, LLC (BLUE), and the fact that SUMMIT and O'BRIEN were merely agents and later servicer for BLUE.  Therefore, BLUE and Travis Masters (hereinafter referred to as MASTERS) were added to the lawsuit. Even later PLAINTIFFS discovered the true money source for the loan was 1SHARPE LP.

## SUMMARY OF FRAUDULENT ACTIVITIES

165. This case demonstrates the length individuals will go when they covet someone else's property and its equity.  As the evidence will establish, everyone wanted to own Plaintiffs' Iowa Federal Courthouse.  So, they worked out a scheme to give GREEN a loan-to-own.  They first baited him with reasonable loan terms and a promise of cash out to remodel his Iowa courthouse. Nevertheless, at the last minute when GREEN could no longer walk away from the loan, they switched the loan, coerced him to acquiesce to a loan he could not possibly repay.  Plaintiffs upon information and belief conclude that this loan was a loan-to-own.

166.     GREEN Contacted Anthony O'Brien (hereinafter referred to as O'BRIEN), the sole member of Summit and Crowne Capital Partners, LLC (hereinafter referred to as SUMMIT) in May 2018 for a refinance of his commercial loan due in June 2018, and O'BRIEN contacted his friend, Andrew DeSorbo for help because O'Brien has never made a commercial loan.  DeSorbo looked at the project, GREEN's Federal Courthouse in IA, and believed they could make a loan to own the property, it had real equity but no strength to make payments without a remodel.

167.     DeSorbo approached Travis Masters and Derrick Land, his close friends.  He presented the opportunity to Masters and Land.  With that, Land contacted 1SHARPE LP. Thereafter, on May 18, 2018, DeSorbo set up two separate companies BLUE FUNDING, LLC (hereinafter referred to as BLUE) to fund GREEN's commercial loan, and BLUE CAPITAL, LLC, to fund residential real estate loans that would be forthcoming from O'Brien and SUMMIT.  The only problem they faced was money.  So, the three set out to raise that money through Masters and Land's relationship with 1SHARPE LP

168.     As the loan had been approved by Darrick Land, Andrew DeSorbo and Travis Masters, they scheduled it to close by June 18, 2018.  However, they failed to close by that commitment date, we believe because the entire loan amount had not been fully raised the $2.43+ Million in time.

169.     Finally, at the last minute and with no ability for GREEN to walk from the loan, they switched the loan to another more foreboding loan.  The initial points were increased from 1% to 2%, as was the interest rate from 7.9% to 9.0%.  In addition, they required GREEN to pay an up-front fee to BLUE FUNDING of $54,687.21.  Not through escrow as a real lender would, but by wire transfer directly to BLUE Funding's New York bank account at Signature bank, before they would close the loan.

170.     In this case, we have three primary defendants who orchestrated this loan-to-own fraud: Travis Masters, Andrew DeSorbo, and Derrick Land.  Evidence will also show there is a fourth partner in the team, a 1SHARPE LP, who is unidentified in the transactions.  Our belief is based on the following facts:

    a)     O'BRIEN repeatedly told Michael Kim, (KIM), the Managing Member of GREEN, that one of his "Partners" was a big-time expert in Mortgage Backed Securities (MBS).

    b)     Upon investigating into the experience of DeSorbo, Land, and Masters, none of these three principals of BLUE FUNDING had any experience in MBS.

    c)     1Shapr LP did focuses on securitization of property (MBS)

174.     These main three (3) team members, DeSorbo, Masters, and Land had set up multiple paper companies in Delaware, all with a common ownership for the singular purpose of disposing of a loan they had initially made through bait-and-switch and loan-to-own frauds.

175. The Three set up a shell company that had no assets or money called "ARCHDALE FUNDING, LLC" in Delaware in November 2018, to transfer the mortgage and they also intended to transfer the note as well.

176.     The loan was originally scheduled to close by June 18, 2018.  Nevertheless, all the funds were not available by that date, most likely because of the type of loan they had planned, a loan-to-own.

177.     Anyone who looks at this package can understand that this is not a legitimate loan because the financials show there is no way KIM can make monthly payments until the renovation is completed.  So, the loan had to be an ARV loan (ARV means After Repair Value) as SUMMIT originally proposed to KIM at 70% LTV (Loan To Value), based on the official Appraisal Report made by CBRE for SUMMIT in June 2018.

178.     After receiving commitments O'Brien, still representing himself as the "Real Lender", refused to honor the prior commitment and mandated different terms at the last minute to KIM, as his partners at BLUE FUNDING and 1SHARPE LP had required and insisted.

179.     They now required the Lender Origination points to O'Brien becoming two (2) points, and a higher interest rate to 9.0%.  And $54,687.21 cash paid up front wired to BLUE Funding's New York bank account at Signature bank.

180.     They all knew this was no real loan because he already had the loan package.  All of these defendants have been around the industry long enough to know loan parameters such as minimum Debt Service Coverage Ratio (DSCR) of 1.25, and it simply was not there.  The defendants just didn't expect KIM to uncover all of their illegal moves.

181.     ARCHDALE FUNDING, LLC. consisting of the same three (3) insiders, Andrew DeSorbo, Derrick Land and Travis Masters, was organized in Delaware on September 28, 2018.

182. ARCHDALE had no capitalization and was never meant to be a real company, as it was a pass-through LLC to allow the funds to move from BLUE to ARCHDALE, and then finally to 1SHARPE LP.  ARCHDALE was merely a shell company with ZERO assets.  Once ARCHDALE was set up online, the group transferred the Mortgage to this shell LLC on November 1, 2018, for NO financial consideration whatsoever.  ARCHDALE was merely a straw purchaser.  From this straw Shell, they then sold the Mortgage to "1SHARPE LP",

183. As its resume recites, 1SHARPE LP acquire non-performing mortgages and notes for less than face value.  KIM's Federal building and its equity met their criteria.  Their real business once again is to acquire problem loans and foreclose on them to make money off the equity.

## TIMELINE

184.      This charade all began with Tony O'Brien, managing partner of SUMMIT and

Crown. O'Brien is a residential loan broker who had a relationship with a deal maker named

DeSorbo.  DeSorbo had business relations with two individuals, Travis Masters, and Derrick Land.

Derrick Land plaintiffs are informed and believe found the relationship with 1SHARPE LP.  The

reason why this plan was so workable: O'Brien and SUMMIT had never made a commercial loan

prior to the KIM loan.  So, O'Brien sought out his friend Andrew DeSorbo for help.

185.DeSorbo operates under an entity called ROBALO CAPITAL, LLC.  The history of this

complicated entity and the scheme is as follows:

   a)   DeSorbo is the Sole Owner of DeSorbo Law, PLLC.

   b)   DeSorbo Law, PLLC is a Registered Agent of Robalo Capital, LLC.

   c)   The managing member of Robalo Capital is 153 Investments, LLC.

   d)   153 Investments, LLC has 2 members, Andrew DeSorbo (at P.O. Box 12312) and
        Derrick Land (at P.O. Box 12312).

   e)   153 Investments, LLC is located at 2118 **ARCHDALE Dr.** Charlotte, NC 28210.

   f)   153 Investments, LLC uses P.O. Box 12312, Charlotte, NC 28220 as its address.

   g)   As does Derrick Land and Travis Masters, their address is a mailbox address.

   h)   The ARCHDALE Dr. address is a residence.

   i)   DeSorbo, Masters and Land set up an LLC called **ARCHDALE Funding, LLC**.

   j)   They also set up another company called ARCHDALE 1 Funding, LLC.

   k)   These companies are used to transfer mortgage loans and their notes to real
        Mortgage purchasers, generally through a double escrow closing with a shell
        company that has ZERO assets.

   l)   Although double escrows are not illegal per se, using a shell as the straw company
        suggests of some element of Fraud.  In this case, **the transfer during litigation is a
        Fraudulent Transfer.**

186.     Unless SUMMIT and BLUE kept their original promise and funded 70% of the LTV to finance the renovation of the building and create additional revenue as the CBRE's June 2018 Appraisal Report indicated, this loan was not a commercially sound loan because without the 70% LTV to pay for the renovation project, the Debt Service Coverage Ratio (DSCR) far exceeded 1.25, the bare minimum ANY real lender would consider.  But a loan based on the fraudulent concept of a "loan to own", naturally only looked at the equity they intended to steal, in this case KIM's $3,000,000 in equity in the Federal Courthouse Building.

187.     However, they apparently didn't know Anthony O'Brien very well.  Anthony O'Brien was a very unsophisticated mortgage hustler.  Unlike Masters and Land that had banking experience at Wells Fargo, O'Brien was a broker doing residential rehab loans.  After O'Brien acted as BLUE' agent during and after the loan closing, he intimidated Michael Kim by calling the loan in default and forcing an 18% interest rate even though the loan was fully conforming at the time, and it backfired.

188.     Derrick Land, Andrew DeSorbo, and Travis Masters came up with a scheme to unload this loan.  Based on the evidence we have so far uncovered; we believe DeSorbo or Land designed the complicated and unlawful exit strategy.  Andrew DeSorbo and Derrick Land formed ARCHDALE Funding, LLC in Delaware on September 28, 2018.  ARCHDALE then registered as a foreign LLC, in NC on November 28, 2018, AFTER they illegally transferred the Mortgage to 1SHARPE LP.

189.     BLUE  assigned the Mortgage only to ARCHDALE on November 1, 2018.  ARCHDALE was merely a paper company without assets.  ARCHDALE assigned the loan to 1SHARPE LP on November 15, 2018 before ARCHDALE was even registered as a Foreign LLC in North Carolina on November 28, 2018.  All the while, BLUE, O'Brien and SUMMIT were in litigation with KIM over this claimed fraudulent loan.

190.  BLUE FUNDING assigned the loan to ARCHDALE on November 1, 2018, during the state litigation which was never resolved and never tried on the merits.  **ARCHDALE is not an Arm's Length transfer**, as the same people who are involved with BLUE FUNDING, BLUE CAPITAL, are Andrew DeSorbo, Derrick Land, Travis Masters, ROBALO CAPITAL LLC. and 153 Investments LLC, are the same members of ARCHDALE.  ARCHDALE was never capitalized.

191. ARCHDALE assigned the loan to 1SHARPE Opportunity Intermediate Trust on November 15, 2018, again without Notice to Plaintiffs and while the loan is in litigation.

192. ARCHDALE registered in North Carolina on November 28, 2018 as a Foreign LLC.

193. BLUE FUNDING recorded the assignment with ARCHDALE at the County Recorder's Office on December 21, 2018.

194.  ARCHDALE also recorded the assignment with 1SHARPE at the County Recorder's Office on the same day December 21, 2018. <u>Note a double escrow</u>, as well as a SIMULTANEOUS CLOSING involving these three (3) companies. Note 1SHARPE was aware of the double escrow because the note and mortgage were not in the name of ARCHDALE at the time.

## <u>DESORBO'S PART IN THIS ENTERPRISE</u>

195. DESORBO is the Sole Owner of DeSorbo Law, PLLC.

196. DeSorbo Law, PLLC is a Registered Agent of Robalo Capital, LLC.

197. 153 Investments, LLC is the Managing Member of Robalo Capital, LLC.

198.      153 Investments, LLC has 2 members, Andrew DeSorbo (at P.O. Box 12312) and Derrick Land (at P.O. Box 12312).

199.       153 Investments, LLC is located at 2118 ARCHDALE Dr. Charlotte, NC 28210. 153 Investments, LLC uses P.O. Box 12312, Charlotte, NC 28220 as a mailing address.

200.     Therefore, ANDREW DESORBO is IN FACT all of the following and controls ALL

of these entities, and has been a part of or orchestrated this RICO FRAUD scheme:

201. DeSorbo Law, PLLC, Robalo Capital, LLC, 153 Investments, LLC,

**ARCHDALE Funding, LLC**, BLUE Funding, LLC, BLUE Capital, LLC, are ALL controlled by

DeSorbo.

202. We also believe DeSorbo has some relation to SUMMIT, while discovery is calculated to

discover just what that relationship is.

### ISSUES INVOLVING 1SHARPE

203. 1SHARPE LP purchased a loan with seven months remaining.  1SHARPE knew that a

Notice of Default had already been issued as they immediately accelerated the loan balance.  In

addition, the loan was non-performing and they must have also known, if they did any due diligence

at all, the loan and the lenders were in litigation over loan fraud.  They knew there was a double

escrow because the title report and loan purchase underwriting would have disclosed the Loan was

still recorded in the name of BLUE Funding.  In Fact, the loan was NOT even held by ARCHDALE

on the day of transfer!

204. 1SHARPE LP didn't care that they would buy a piece of a fraud litigation, as their only

concern was the property equity.  If they did not know the loan was in litigation, a simple due

diligence such as obtaining an Estoppel Certificate from Michael Kim himself, or conducting a

further investigation of why there was a newly formed LLC selling them a loan they did not even

own.  A real lender also would have never acquired this loan where the expenses were almost

$9,000.00 a month in excess of the Courthouse income, unless they wanted to own the property and

take the $3,000,000+ in equity.

205.  Plaintiffs also Believe 1SHARPE LP is not an innocent purchaser but a major conspirator

in the theft of GREEN and TRAIL's estate. They thought they were going to make a big score by

stealing the Iowa Federal Courthouse equity.

## DEFENDANTS' ATTEMPT TO TRANSFER VENUE

206.     On December 10, 2018, BLUE Funding VOLUNTARILY transferred this case from the Circuit Court of the Twelfth Judicial Circuit in Sarasota, Florida, to the United States District Court for the Middle District of Florida, CLEARLY stating in its Notice of Removal (Doc 1)  that "**This Court has original jurisdiction over this Action under 15 U.S. Code § 1692, and because complete diversity exists between the parties and the amount in controversy exceeds the value of $75,000.**"  Then in its Motion to Dismiss (Doc 7), BLUE requested to transfer this case to North Carolina just because both O'Brien, the sole member of SUMMIT (Delaware LLC) and DeSorbo, the managing member of BLUE and now ARCHDALE FUNDING, LLC, both of which are DELAWARE entities, happen to be North Carolina residents.  The real reason for its request for the transfer is because:

a)  DESORBO is licensed to practice in North Carolina and can litigate on behalf of BLUE while running up costs for the Plaintiffs outside the current jurisdiction of Florida.

b)  Just by venue shopping and stalling this case from going to a jury trial in the Middle District of Florida, BLUE can now open a brand-new case in Iowa, now with their new entity ARCHDALE being the Plaintiff and start a foreclosure action against KIM and Green World Council Bluffs, LLC, hoping the Court would never find out about their illegal transfers and unlawful maneuvers.  In fact, Derek Land had already filed a false declaration in which Land claims **his physical business address** is a P.O. Box. that belongs to DeSorbo.

207.     What they failed to disclose to the Court or Plaintiffs was that as of November 1, 2018, BLUE FUNDING no longer held the mortgage and they never had the note, having sold the Mortgage only to ARCHDALE (its family of companies, as they finally confirmed once they were caught) for no money consideration.  ARCHDALE then sold the loan [amount is in question] via double escrow to 1SHARPE LP on November 15, 2018.

208.     Both assignments were **SIMULTANEOUSLY recorded** at the County Recorder's Office on December 21, 2018 after a double escrow close, where BLUE transferred to ARCHDALE and ARCHIDALE transferred to 1SHARPE at the same time, at 2:54:01 PM on 12/21/18.

209.     BLUE Funding set up a double escrow for a simultaneous closing, where ARCHDALE had no money or capital but the double closing allowed the money to move from 1SHARPE.  The only real money was the undisclosed sum of funds put up by 1SHARPE LP.

210.     In BLUE Funding, DeSorbo, Masters and Land's ongoing fraudulent conduct continued.  On January 1, 2019, BLUE presented Michael Kim a bill for their usual payment they claim.  On the January 1, 2019 statement, that $50,433.77 is now due to them.  Yet they had ALREADY divested themselves of this loan, they sold the Note and Mortgage on November 1, 2018.  This is now another count as **Fraudulent Billing**.

211. On or about August 24, 2018, only 37 days after the loan closing and while Plaintiffs were current on their payments, Defendants declared a default and raised Plaintiffs' interest to the default rate of 18%.

212.The issue Defendants are attempting to rely on is set forth in the Note of July 16, 2018, i.e. paragraph 3.8. which states "*any representations or statement herein or any other representation or statement made or furnished to lender by maker, which was materially incorrect or misleading at the time it was made or furnished.*"

213. Plaintiffs have not made any statement to Lender that was materially incorrect or misleading.  All statements to lender were true and accurate at the time they were made.

214. In addition, Plaintiffs could not perform as Defendants demanded without losing GSA as a tenant and leaving the Courthouse empty. What Defendants demanded of Plaintiffs was an impossibility of performance, and would have caused a frustration of the purpose and consideration for the loan. Even if Plaintiffs could go ahead with the halfway house, defendants failed to provide the capital reserve for that purpose, as they had previously agreed and covenanted to do on the LOI with 70% Loan to Value (LTV).

215. In addition, Plaintiff lacked the capital to renovate the property to accommodate a halfway house, when the purpose of this loan was to take cash out for that purpose, which Defendants agreed to do.  On the day of closing, Defendants only wanted to pay off the previous lender and some point money for O'Brien, who still acted as if SUMMIT was the lender.

216. Lender has taken an inaccurate position because until this lawsuit, they were clouded by their desire to own Plaintiffs' Real Property.  In fact, Defendant O'Brien has stated on numerous occasions in email and phone conversations of his intent to take Plaintiffs' property when the loan is due on July 16th, 2019.

217. Plaintiffs are informed and believe the reason Defendants are acting in an unreasonable manner is because they intend to destroy Plaintiffs GSA lease, so they will not be able to make the mortgage payments.  This belief was enforced on August 28, 2018 when Defendant O'Brien informed Plaintiffs that his attorney was contacting GSA as his email statement follows: "***Our Counsel is contacting the GSA to discuss this situation and when they became involved. … How do you think GSA will react if they find your property is in litigation?***"

## COUNT 9
## CIVIL HARRASSMENT
### Against all Defendants

218.  Plaintiffs repeat, re-allege and incorporate their introduction and paragraphs 1-216 as though the same are set forth in full hereat.

219.     Beginning on or about August 14, 2018 through August 28, 2018, Defendant O'Brien made approximately 8 phone calls to Plaintiff and another 11 email contacts, threatening to take his property away from him unless Plaintiff Kim pays him another 3 months of PREPAID interest payments, in addition to the 3 months of prepaid interest that Plaintiffs already made at the July 16th closing.  This demand was not part of the loan agreement or the note. Rather this demand smacks of an attempt to extort money from Plaintiffs that was not rightfully due.

220.     Additionally, Defendant O'Brien also threatened Plaintiffs that if he did not put the halfway house at the property, he would contact the tenant and get them to move out.

221.     O'Brien has made the same threat on several occasions, and Plaintiffs are informed and believe, O'Brien and or his attorney, have made that wrongful contact.

222.     These acts were directed against a Florida Resident on behalf of a Washington resident, by both telephonic calls directed and by emails directed to a both KIM and GREEN.

223.     Defendant O'Brien sending harassing messages, by phone calls or e-mail, over a period of time (for 14 days) constitutes civil harassment.

224.     Contacting Plaintiffs' tenants and trying to get them to vacate is also harassment.

225.     Plaintiff Kim was placed in fear and apprehension that Defendants were going to steal his Real Property and additionally Plaintiff was placed in a reasonable fear of his life.

226.     Beginning on or about August 14, 2018 through August 28, 2018 Defendant O'Brien made approximately 8 phone calls to Plaintiff Kim and another 11 email contacts all threatening Plaintiff that he was going to take his property away from him.  This amount of harassment is also considered stalking.

227.     The actions by O'Brien have caused Michael Kim Plaintiff's Managing member to suffer deep and severe emotional distress, mortification and anxiety for which he is entitled to additional damages.


### COUNT 10
### BREACH OF CONTRACT OF JULY 16, 2018
### Green World against all Defendants, and KIM on his Guarantee
### except Robson, 1SHARPE and US Bank


228.Plaintiffs repeat, re-allege and incorporate their introduction and paragraphs 1-226 as though the same are set forth in full hereat.

229.      On or about July 16, 2018, Plaintiffs and Defendants entered into two (2) valid contracts.  The first contract was for a Loan Agreement against real property, and the second was for a Personal Guarantee for that loan from Plaintiff Michael Kim.

230.     Both Plaintiffs performed as agreed except as to any part of those agreements for which they were prevented to perform through acts of these defendants.

231.     Defendants have breached those agreements by declaring a default when the property was not in default and by accelerating the interest to the default rate of 18% (which doubled the Mortgage Payment) when the property was not in default, and they had no right to increase said interest from the agreed contract rate of 9%, nor demand additional Prepaid Interest payment for another 3 months up front.

232.     Defendants' Breach was a material breach, as they changed the terms of the agreement raising the interest rate to 18% and declared a default while the contract was in good standing and Plaintiffs had fully performed they knew neither KIM or Green could make a payment based on 18% interest they also knew KIM and GREEN could not even make a payment at the 9% interest.

233.     Defendants' material breach is significant enough to excuse both Plaintiffs from fulfilling their part of the contract.

234.     Plaintiffs have notified Defendants of the breach and Defendants have failed and refused to rectify it.

## COUNT 11
## BREACH OF THE COVENENT OF GOOD FAITH AND FAIR DEALING
### (The Contract of July 16, 2018)
### Plaintiff Kim on his Guarantee against all Defendants

235.     Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1- 233 as though the same are set forth hereat in full:

236.     On or about July 16, 2018, Plaintiff Kim entered into a contract with Defendants where he personally guaranteed performance of a Real Estate Mortgage between Defendants and Plaintiff Green World Council Bluffs, LLC.

237.     Defendants declared the loan to be in default and have accelerated the interest rate to 18% while the loan was current.  This acceleration of the loan interest to 18% affects Plaintiff Kim as the guarantor and as the Managing Member of Green World Council Bluffs, LLC.

238.     Accelerating the interest rate and declaring the property to be in default while the loan was current was in bad faith and was unfair and dishonest dealing.

239.     Every contract contains the implied covenant of good faith and fair dealing.  The covenant also requires honesty in the business relationship.  To act in good faith and deal fairly, a party must act in a way that is honest and faithful to the agreed purposes of the contract and consistent with the reasonable expectations of the parties.

240.     Defendants have made it clear by statements to Plaintiff Kim through emails and phone calls, that they intend to take his property from him by foreclosing on his property.

241.     Declaring a default while the loan is current, and raising the interest rate from 9% to 18% while there is no default or breach, and informing Plaintiff Kim that they intend to take his property from him, is evidence that they have breached the covenant of good faith and fair dealing and of acting dishonestly and unfaithfully to the purpose of the contract.

242.     Because of the bad faith on the part of the defendants and each and all of the them KIM is excused from performance of his guarantee.

### COUNT 12
### BREACH OF THE COVENENT OF GOOD FAITH AND FAIR DEALING
### (The Contract of July 16, 2018)
### Against all Defendants

243.      Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1-241 as though the same are set forth hereat in full:

244.     On or about July 16, 2018, Plaintiff Green World entered into a contract with Defendants for a Real Estate Mortgage.

245.     Defendants declared the loan to be in default and have accelerated the interest rate from 9% to 18% while the loan was and remained current.  This acceleration of the loan interest to 18% affects Plaintiff Green World.

246.     Accelerating the interest rate and declaring the property to be in default while the loan was current was in bad faith and was unfair dealing.

247.     Every contract contains the implied covenant of good faith and fair dealing.  The covenant also requires honesty in the business relationship.  To act in good faith and deal fairly, a party must act in a way that is honest and faithful to the agreed purposes of the contract and consistent with the reasonable expectations of the parties.

248.     Defendants have made it clear by actual statements to Plaintiff Kim through numerous phone calls and emails that they intend to take his property from him.

249.     Declaring a default while the property is current, and raising the interest rate from 9% to 18% while there is no default or breach, and informing Plaintiff Kim that they intend to take his property from him, is evidence that they have breached the covenant of good faith and fair dealing and of acting dishonest and unfaithful to the purpose of the contract.

### COUNT 13
### COMMON LAW CIVIL EXTORTION
**Against O'Brien, DeSorbo, Masters, Land, SUMMIT and BLUE Funding**

250.     Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1-248 as though the same are set forth in full hereat.

251.     Defendant O'Brien has threatened to file a criminal complaint if Plaintiffs did not put a halfway house at his Federal Courthouse Property.

252.     Defendant O'Brien has also threatened to contact GSA and get them to move out of Plaintiffs leased premises.

253.     Defendant O'Brien has made these threats on numerous occasions.

254.     Defendant O'Brien has also made it clear that they are going to take Plaintiffs' real property, and he has made these threats on numerous occasions.

255.     Plaintiffs have been informed and believe Defendant O'Brien carried out his threats and has been in touch with GSA and has incited them to leave Plaintiffs' property.

256.     Defendant O'Brien had no lawful right to make the treats he made and had no lawful right to contact GSA.

257.    This conduct as set forth herein, amounts to common law extortion for which Plaintiff seeks all damages available to him, including the loss of GSA as a tenant, the monthly rental for the lease, and value depreciation occasioned by the tenant, GSA.

258.     Defendants also forced Plaintiffs to pay a higher interest rate at closing of the June 2018 escrow, the rate was to be 7.9% but Defendants failed and refused to close at that rate and the day before July 16, 2018 closing, Defendants threatened to not close the loan UNLESS Plaintiffs agreed to a 9% interest rate and 2 points.

259.     Plaintiffs had no choice but pay the difference to close the loan, due to Defendants civil extortion, regarding the June 6, 2018 contract.  Plaintiffs were forced to also pay a previous lender a penalty for a late closing of approximately $22,646.06.

260.      Defendant made a verbal, and printed communication to Plaintiffs.

261.     In that communication, Defendant O'Brien threatened to accuse Plaintiffs of a crime.

262.     In that communication, Defendant O'Brien threatened to injure Plaintiff Kim's reputation and his Courthouse Building.

263.     Defendant's threat was made maliciously.

264.     The Defendant's threat was made with the intent to extort money or any pecuniary advantage from Plaintiffs.

265.     The Defendant's threat was made to compel Plaintiffs to pay money not rightfully due him, and to do an act against Plaintiffs' will.

266.    Plaintiffs were also required to pay to Defendants $24,305.43 in additional points since Defendants unilaterally made that last-minute change at the closing or threatened not to make a loan.

267.    At 9%, Plaintiffs paid approximately $218,748.87 in annual interest on the loan.

268.    At 7.9% interest Plaintiffs would have only paid approximately $192,012.90 annually.

269.    Plaintiffs overpaid in interest due to Defendants' breach of the June 6, 2018 agreement, approximately $26,735.97 in additional interest.


## COUNT 14
## DECLARATORY RELIEF
### Against all Defendants

270.    Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1- 268 except any claim for exemplary damages as though the same are set forth hereat.

271.    On or about July 16, 2018, Plaintiffs and Defendants entered into two (2) valid contracts.  The first contract was for a loan against real property, and the second was for a Personal guarantee for that loan from Plaintiff Michael Kim.

272.    On or about August 14, 2018, Defendants declared a default and increased the interest rate from 9% to 18%.

273.    A controversy currently exists between Plaintiffs and Defendants as to whether Defendants can declare a default and increase the interest rate from 9% to 18% while payments are current, and there has been no breach of the agreement.

274.    Plaintiffs believe they cannot.  Defendants believe they can.

275.    In addition, the controversy extends to liability to repay a loan based on a loan-to-own Fraud.

276.    Therefore, Plaintiffs request a judgment from this court defining the duties and obligations of the parties under the loan agreement.

## COUNT 15
## FRAUD BY MISREPRESENTATION
**Against O'Brien, SUMMIT, DeSorbo, Masters, Land, and BLUE Funding**

277.    Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1-216 as though the same are set forth hereat in full.

278.    On or about May of 2018, Defendant O'Brien and SUMMIT agreed to finance Plaintiffs' Federal Building in Iowa.  They ordered an appraisal which Plaintiffs paid for.  That appraisal offered the value based on two events.  If Plaintiffs rented part of the property to a halfway house, the value would be $5,640,000.  Moreover, if the space remained empty the value was about $3,450,000.

279.    Defendants made the loan of $2,382,710.95 (not counting 2% commission and $175 so-called underwriting fee for themselves) based on the halfway house not being rented out. The Loan to Value (LTV) was approximately 43% when generally a property will command LTV at 70 or even 75% LTV.  In fact, O'Brien committed to loan 70% of the After-Repair Value (ARV) which is $3,948,000, but instead loaned only $2,430,543 at the last minute, which didn't include any cash out amount to renovate the building.  This is exactly how the Defendants set up the "Bait-and-Switch" and "Loan-to-Own" loan for themselves.

280.    KIM relied on the representations of Defendants and his reliance was justified because he had made a loan previously with Summit

281.    Defendants breached the agreement in under 30 days after the loan closing, by declaring a loan default while payments were current through the month of November, having been paid in advance per Defendants last minute closing requirement.  At the time Defendants declared a default, they also increased the interest rate from 9% to 18%, which has caused Plaintiffs mortgage payment to double.

282.     From this breach of the loan agreement so quickly, and while the loan was actually current, would suggest that Defendants never intended to honor the Note and Mortgage but were intent to steal Plaintiffs' courthouse for themselves.

283.     Defendants' actions are invocative of a fraud to steal Plaintiffs' Federal Courthouse, including their contact with the tenant in an attempt to make them abandon the lease.  For the purpose of Plaintiff having an empty building so he could not make the Mortgage payments.

284.     Defendants O'Brien and SUMMIT represented to Plaintiff that as long as Plaintiff made his payments, he would have the right to enjoy his property.

285.     Plaintiffs relied on those representations and the reliance was justified.

286.     Defendants never intended to honor their loan agreement for the following reasons.

287.     On or about July 16, 2018, Plaintiffs and Defendants entered into two (2) valid contracts.  The first contract was for a Loan Agreement against real property, and the second was for a Personal Guarantee for that loan from Plaintiff Michael Kim.

288.     Both Plaintiffs performed as agreed.

289.     Defendants have breached those agreements by declaring a default when the property was not in default, and by accelerating the interest to the default rate of 18% on or about August 14, 2018 when the property was not in default, and they had no right to increase said interest from the agreed contract rate of 9%, nor demand additional Prepaid Interest payment for another 3 months up front.  SUMMIT was clearly acting as BLUE's agent.

290.    Defendants' Breach was a material breach, as they changed the terms of the agreement raising the interest rate to 18%, and declared a default while the contract was in good standing and Plaintiffs had fully performed.

291.    Defendants material breach is significant enough to excuse both Plaintiffs from fulfilling their part of the contract.

292.   Plaintiffs have notified Defendants of the breach and they have failed and refused to rectify it.  Most importantly, BLUE as actual lender never wanted to be found by Plaintiffs, and contacted Plaintiffs ONLY after the initial lawsuit was filed against its agent, SUMMIT.

293.   Defendants knew at the time they made the loan they would not honor the terms thereof, but made the representation in order to induce Plaintiffs to sign the note and mortgage.


**COUNT 16**
**FRAUD by BAIT AND SWITCH**
**Against O'Brien, SUMMIT, BLUE Funding,**
**DeSorbo, Masters, Land, and Archdale Funding**


294.   Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1-292 as though the same are fully set forth hereat.

295.   **Bait-and-switch loans are considered a fraud under most states and especially in WASHINGTON and Florida,  Deceptive & Unfair Trade Practices Act  (DCUTPA) and includes false advertising: which is a 2nd degree misdemeanor actual damages if in bad faith; INJUNCTION; declaratory judgment that act is violation.  Damages vary based on industry where deceptive trade practice is used.  Generally, false advertising is a 2nd degree misdemeanor; willful unfair trade practices in any industry may result in up to $10,000 civil penalty for each violation; reasonable attorney's fees and costs.  A Civil complaint can also award actual damages.**

296.   Defendants offered Plaintiffs loan terms of 7.9% interest and one point (1%).

297.   The loan was to close by June 18, 2018 with those terms.

298.   Defendants knew Plaintiffs had to refinance out of his previous loan by that date.

299.    Defendants then changed the loan terms to 9% and two (2) points and closed on July 16, 2018, placing Plaintiffs in a situation where they were forced to close the loan.  **THIS IS both DECEPTIVE ACT and UNFAIR PRACTICE.**

300.    Plaintiffs were required to pay a previous lender a penalty for a late closing of approximately $22,646.06.  **THIS IS ACTUAL DAMAGES according to act.**

301.    Plaintiffs were required to pay to Defendants $24,305.43 in additional points since Defendants unilaterally made that last-minute change at the closing.  **THIS IS UNFAIR PRACTICE according to the act.**

302.    At 9.0%, Plaintiffs paid approximately $218,748.87 in annual interest on the loan.

303.    At 7.9% interest Plaintiffs would have only paid approximately $192,012.90 in annual interest on the loan.

304.    Plaintiffs overpaid in interest due to Defendants' bait-and-switch tactic, approximately $26,735.97 in additional interest.  **THIS IS ACTUAL DAMAGES according to to the act.**

305.    The act of Bait and Switch forced Plaintiffs to pay a higher interest rate and an additional 1 point when they knew they had to close this loan, constitutes a Fraud.  **THIS IS both DECEPTIVE ACT and UNFAIR PRACTICE.**

306.    Plaintiffs have been damaged by Defendants' conduct which is defined as a Fraud, in the approximate amount of $51,041.40 plus the late penalty they had to pay a previous lender for closing late of approximately $22,646.06.  This constitutes a damage of approximately $73,687.46 in **ACTUAL DAMAGES according to the act**.

307.    Not fully understanding the difference between national banks and private lenders (a.k.a. loan sharks) in the lending industry, some local circuit courts without proper financial education may inaccurately believe that act may not apply to an entity (anything with an Inc. or LLC with EIN instead of Individuals with Social Security Numbers), but according to the FDUTPA, the only exceptions are as follows:

**501.212 Application.**--This part does not apply to:

(4)  Any person or activity regulated under laws administered by:
    (a)  The Office of Insurance Regulation of the Financial Services Commission;
    (b)  Banks and savings and loan associations regulated by the Office of Financial Regulation of the Financial Services Commission;
    (c)  Banks or savings and loan associations regulated by federal agencies; or
    (d)  Any person or activity regulated under the laws administered by the former Department of Insurance which are now administered by the Department of Financial Services.

As you can see above, the ONLY exempt parties for FDUPTA are the individuals and ENTITIES that are already heavily regulated by Federal Agencies such as FSC or FDIC.

308.  **Since NONE of the Defendants are regulated by FSC or FDIC, NONE of the Defendants shall escape from the penalties of FDUTPA.  Period!**

309.  **Since Defendant Derrick Land clearly admitted that Defendant BLUE Capital, LLC's "family of companies" include Defendants BLUE and ARCHDALE, NONE of the Defendants can be considered as a "THIRD PARTY".  Therefore, ANY case laws that could have applied to benefit REAL third-party purchasers of the loan SHALL NOT and DO NOT apply to ANY of the Defendants.**

310.  **EVERY allegation mentioned in this Cause of Action is SPECIFIC to BLUE and ARCHDALE, since both entities are created and managed by the same 3 defendants, LAND, MASTERS, and DeSorbo, who have personally engaged in the loan scheme from its inception!**

311.  Not many people in the legal field truly understand how loss of Real Property constitutes irreparable harm.  Just to understand how REAL Property can cause irreparable harm to a party, let's take a look at our own history for a moment.  Native Americans lost their land to the United States Government.  Then they were given Indian Tribal Land and cash as a monetary compensation.  How did the lives in the Indian Reservations change compared to those of us living in the United States territory?  It doesn't take a genius to figure out that real estate is one of the most IMPORTANT (if not THE most important) assets that ANY person living on earth can have.  You are either a landlord, or a

tenant who ends up living your entire life working to pay your rent to the landlord, throughout the history of mankind.  The normal rule that market value damages are sufficient compensation for loss of real property has not been held to apply in cases where market value is too difficult to find, or when the application of the general rule would result in manifest injustice to the owner or the public. First, for special purpose property—a church, for example—there generally is not an active market from which the market value, or its diminution, can be determined. In these cases, courts have struggled with the proper measure of damages when the property is damaged or destroyed.  In Trinity Church v. John Hancock Mut. Life Ins. Co., 502 N.E.2d 532 (Mass. 1987) for example, the court concluded that the diminution of value of a church that had been damaged during the construction of another building in the area could not be ascertained using the normal, market value rule of damages. The court noted two instances in which replacement or restoration costs had been granted: (1) cases involving special use property, in which the cost of restoration, minus the depreciation that was necessarily fixed as a result of the restoration; and (2) "contexts where diminution in market value is unavailable or unsatisfactory as a measure of damages," where the cost of restoration is likewise used as the measure of damages.  The court in this case made clear, however, that when courts deviate from the market value rule of damages, the cost of replacement or reconstruction must be reasonable in light of the damages inflicted.  Similarly, **courts have recognized that a person conducting business in a unique location suffers a unique loss that cannot be remedied with mere market value damages**.  What follows from a finding of uniqueness in these circumstances is the conclusion that the Plaintiff is entitled to compensatory damages for the lost business separate from the market value of the property.  These cases make clear that the unique value of the property flows from the nature of the land and the owner's use of it.

312.   Loss of a United States Federal Courthouse and its RENTAL INCOME to a Federal Contractor, whose main livelihood is to serve the United States District Court for over 11 years, CANNOT be arbitrarily valued and this Court must remember the FACT that **loss of Plaintiffs' extremely rare FEDERAL COURTHOUSE real property and its income WILL cause IRREPARABLE INJURY to the Plaintiffs.**

313.   **Plaintiffs are currently suffering irreparable harm, and injunctive relief is IMMEDIATELY needed.  Plaintiffs are seeking injunctive relief from this court as we speak.**

314.   **By committing fraudulent conveyance within its "family of companies" to transfer the loan and filing a foreclosure lawsuit in Iowa, Defendants BLUE and ARCHDALE placed a receiver on the Plaintiffs' Federal Courthouse Building, and started taking ALL rental income since March of 2019, resulting in** **"NO INCOME" for the Plaintiffs since March 2019. Defendants are FULLY aware that in our legal system, even the wrong and evil can prevail if they can just cut the cash flow of the righteous and just.  Without income from the subject property, Plaintiffs suffered a tremendous hardship since legal fees in both states are mounting up and can hardly file pleadings on time in either state.  There is present and clear HARDSHIP for Plaintiffs in the absence of an injunction by this Court, where the Defendants must be disallowed from taking rent from the Plaintiffs' tenants, and all funds they unlawfully took away from the Plaintiffs since March 2019 shall be returned to the Plaintiffs IMMEDIATELY after the Injunction Order is placed on the Defendants.  As such, the balance of hardships clearly weigh in favor of the Plaintiffs.**

315.   The acts of Defendants were intentional, Fraudulent and malicious.  They were carried out to harm Plaintiffs financially, and therefore Plaintiffs are entitled to exemplary damages, **to be determined by the JURY that will make their own determination based on FDUTPA.**

## COUNT 17
## <u>Breach of Contract of June 6, 2018</u>
### Against O'Brien, SUMMIT, BLUE Funding,
### DeSorbo, Masters, and Land

316.   Plaintiffs repeat, reallege and incorporates their Introduction and paragraphs 1-314 as though the same are set forth in full hereat.

317.   On and about June 6, 2018 Plaintiffs and Defendants entered into a contract to refinance Plaintiffs' Iowa Federal Courthouse.  The terms of the agreement were 7.9% interest and one (1) point to Lender.  Both Plaintiffs and Defendants agreed on the terms and a contract was formed.

318.   This contract is evidenced with written agreement specifying the above stated terms.

319.   On or about June 7, 2018. Defendants breached this agreement by increasing the points to 1.5 but left the interest rate at 7.9%.

320.   Both Plaintiffs and Defendants agreed the loan would close by June 18, 2018 in order for Plaintiffs to avoid additional payoff fees from a previous lender.

321.   Defendants failed to close the loan by June 18, 2018, on information and belief Plaintiffs allege Defendants did not have the money to close.

322.   On or about July 14, 2018, Defendants again changed the terms of the loan, further breaching the loan agreement of June 6, 2018.

323.   Defendants said they would not honor the agreement and made two (2) new terms: the interest rate would be 9% and the points would now be two (2%).

324.   Plaintiffs had no other alternative to pay off the previous lender, because of the time it took for Defendants to acquire the funds necessary to close the loan, and the previous lender itself was ready to declare a default.

325.   Due to Defendants' breach of the June 6, 2018 contract, Plaintiffs were required to pay a previous lender a penalty for a late closing of approximately $22,646.06.

326. Plaintiffs were also required to pay to Defendants $24,305.43 in additional points since Defendants unilaterally made that last-minute change at the closing or threatened not to make the loan at all, while yelling at the Plaintiff during every phone call leading up to the closing.

327. At 9.0%, Plaintiffs paid approximately $218,748.87 in annual interest on the loan.

328. At 7.9% interest Plaintiffs would have only paid approximately $192,012.90 in annual interest on the loan.

329. Plaintiffs overpaid in interest due to Defendants' breach of the June 6, 2018 agreement, approximately $26,735.97 in additional interest.

330. Defendants breach is the actual cause of Plaintiffs financial loss of $73,687.46

### COUNT 18
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
**(The Contract of June 6, 2018)**
**Green World against O'Brien, SUMMIT, BLUE Funding,**
**DeSorbo, Masters, and Land**

331. Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1-329 as though the same are fully set forth hereat.

332. Plaintiff Green World and Defendants entered into an agreement on June 6, 2018. That agreement contained the stated terms of 7.9% interest and one point.

333. The loan was also to close by June 18, 2018

334. Defendants failed to close the loan as agreed.

335. Defendants intentionally placed Plaintiff Green World in a desperate position of closing the loan.

336. On July 16, 2018 Defendants increased the interest rate to 9% and the points to two. And advised Plaintiff Green World if it did not agree to pay the new rate and terms of 9% and two points, they would not close the loan.

337.     Defendants intentionally placed Plaintiff Green World in a desperate position so it was forced to pay the additional interest rate and points.

338.     Defendants acted in bad faith, unfairly and dishonestly by placing Plaintiff Green World in a position that it had to close at any interest rate and points.

339.     Plaintiff Green World was damaged by Defendants' intentional misconduct in the amount of $73,687.46.

340.     Defendants' actions were oppressive, fraudulent and malicious and were intended to harm Plaintiff Green World financially.  Plaintiff is therefore entitled to and requests exemplary damages.

### COUNT 19
### BREACH OF THE CONTRACT
**(The Contract of July 25, 2018)**
**Green World against O'Brien, SUMMIT, BLUE,**
**DeSorbo, Masters, and Land**

341.     Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1- 339 as though the same are set forth hereat in full.

342.     Plaintiff Kim and Defendants entered into an agreement on July 25, 2018.  That agreement contained the Plaintiff's escrow amount of additional $48,052.06, to be held by Lender until February 16, 2019, at which time Lender was to return the funds back to Plaintiff.

343.     Plaintiff's Iowa Attorney sent a Demand for Release of Funds to the Defendants on March 18, 2018.

344.     Defendants failed to return Plaintiff's escrowed amount of $48,052.06 as agreed.

345.     Defendants intentionally placed Plaintiff in a position to have less cash funds to fight against the Defendants in this legal dispute.

346.     Defendants acted in bad faith, unfairly and dishonestly by placing Plaintiff in a position without ever returning Plaintiff's funds, by intentionally acting as an Escrow themselves, rather than using a legitimate Escrow company or an attorney escrow account.

347.     Plaintiff was damaged by Defendants' intentional misconduct in the amount of $48,052.06. In addition they failed to provide the cash out they agreed to provide for Plaintiff to upgrade the courthouse and without those fees Plaintiff could not generate the additional income he needed

348.     Defendants' actions were oppressive, fraudulent and malicious and were intended to harm Plaintiff Kim financially.  Plaintiff is therefore entitled to and requests exemplary damages.


### COUNT 20
### BILLING FRAUD
### Against all Defendants INCLUDING 1SHARPE LP

349.  Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1- 347 as though the same are set forth hereat in full.

350.  The term "Billing Fraud" encompasses a variety of unfair and deceptive acts relating to bills and billing practices, from unauthorized charges and hidden fees, to bait-and-switch schemes, false communication, and more.

351.  Various federal and state billing laws protect consumers from fraudulent billing practices, including:


**Communications Act of 1934 (47 U.S.C. § 151 et seq.)**

A federal law that protects customers from fraudulent billing practices related to their communications services. The Act established the Federal Communication Commission (FCC), which regulates charges under its Truth-in-Billing policy. Under the FCC's Truth-in-Billing rules, servicers are required to provide clear billing disclosures, describing each service for which the customer has been billed.

**Truth in Lending Act (TILA) (15 U.S.C. § 1601 et seq.)**

A federal law enacted in 1968, established to protect consumers in their dealings with lenders and creditors. TILA mandates that creditors must disclose important information such as credit terms to consumers.

**Fair Credit Billing Act (FCBA) (15 U.S.C. § 1601 et seq.)**

A federal law designed to protect consumers from unfair credit billing practices.  FCBA provides guidelines for both consumers and creditors including procedures to manage disputes regarding billing statements, and requires immediate correction of billing errors.

**Fair Debt Collection Practices Act (FDCPA) (15 U.S.C. § 1692 et seq.)**

A federal law established to promote fair debt collection and eliminate abusive practices in the collection of debts.

352.  On 11/1/18, BLUE committed Fraudulent Conveyance by assigning the Loan to ARCHDALE FUNDING, LLC for $0 Consideration.

353.  On 11/9/18, SUMMIT still acted as BLUE's Servicer and agent, via email to Plaintiff's Attorney.

354.  On 11/15/18, ARCHDALE committed Fraudulent Conveyance by assigning the Loan to 1SHARPE LP., the new loan buyer or funding source.

355.  On 12/21/18, BLUE and ARCHDALE recorded the Fraudulent Assignment and double closing with 1SHARPE in Pottawattamie County, IA.

356.  Yet on 1/1/19, BLUE sent a fraudulent Monthly Statement, still acting as if they were the Lender.

357.  On 1/28/19, BLUE sent ANOTHER forged Monthly Statement after it sold the loan to ARCHDALE.  **BLUE also admitted that ARCHDALE FUNDING, LLC is now is part of "its family of companies".**

358.  Defendants broke every law stated in Paragraph 291 above.

359.  Defendants acted in bad faith, unfairly and dishonestly by tricking both Plaintiff and this Court, by intentionally acting as they were the Lender, rather disclosing that they have already committed MULTIPLE Fraudulent Conveyances since November 1, 2018.

360.  Plaintiff was damaged by Defendants' intentional misconduct, having to spend weeks of private investigation to gather evidence and uncover the truth.

361.  Defendants' actions were oppressive, fraudulent and malicious and were intended to harm Plaintiff Kim financially.  Plaintiff is therefore entitled to and requests exemplary damages.

## COUNT 21
## <u>BREACH OF FIDUCIARY DUTY</u>
### Against all Defendants

362.  Plaintiffs repeat, reallege and incorporate their introduction and paragraphs 1- 360 as though the same are set forth hereat in full.

363.  A fiduciary duty is an obligation to act in the best interest of another party.  When a Lender misbehaves, many courts will find a fiduciary relationship. **<u>When a Lender overreaches or exerts undue influence on the borrower, and fails to Act in Good Faith, the bank can find itself a fiduciary.</u>**

364.  A New Jersey Appeals Court recently ruled that a bank can have a fiduciary duty if it engages in an "**<u>egregious breach of the lender's duty of good faith and fair dealing.</u>**" The Court sited cases where a bank repeatedly threatens to call a loan due and put the borrower out of business for some hyper technical alleged breach.  <u>The Court ruled that the Lender did so because they can extort additional personal guaranties, higher interest and fees or additional collateral.</u>

365.  Lender also takes fiduciary duty when it takes **Effective Control of the Borrower**.  This scenario arises when a Lender takes so much control of the Borrower's business that they effectively call all the shots. Placing a manager or a receiver in the customer's business, deciding what bills the borrower can pay or placing a receiver or designated management consultant can be enough to make the bank a fiduciary.

366.  There are four (4) elements to a claim or cause of action for breach of fiduciary duty:

    a)      The defendant was acting as a fiduciary of the Plaintiff;

    b)      The defendant breached a fiduciary duty to the Plaintiff;

    c)      The Plaintiff suffered damages as a result of the breach; and

    d)      The defendant's breach of fiduciary duty caused the Plaintiff's damages.

367.  On 8/16/18, SUMMIT threatened to take the Courthouse Building if Plaintiffs chooses to keep the Federal District Court as tenants over the Halfway House project, since SUMMIT and its "PARTNERS" wanted to FLIP the loan into Commercial Mortgage Backed Securities (CMBS), where the ONLY expert in this subject matter is ROBSON.

368.  On 8/27/18, SUMMIT declared DEFAULT on behalf of BLUE, raising interest rate to 18%, when Plaintiffs refused to pay ANOTHER 3 months of additional interest payments, after Defendants already extorted 3 months of additional interest payments up front prior to the 7/16/18 closing.

369.  On 2/18/19, ARCHDALE filed a lawsuit in the State of Iowa, to place its designated Receiver on Plaintiffs' Federal Courthouse Building, to interfere with Plaintiffs' affairs regarding its tenants and its day-to-day operation.

370.  Defendants willfully acted clearly as a fiduciary of the Plaintiff, as shown in above.

371.  Defendants breached a fiduciary duty to the Plaintiffs, since everything they have done as identified above clearly demonstrated that they had ZERO interest in the Plaintiffs' financial well-being.  For Defendants, flipping the loan to a Commercial Mortgage Backed Securities (CMBS) and scoring another quick cash deal was a lot more important than doing what's in the Plaintiffs' best financial interest.

372.  Plaintiff suffered damages as a result of the breach, since Defendants are actively interfering with the Plaintiffs' day-to-day operation, including the building's rental income as well as the long-term lease possibility with GSA, its main tenant.

373.  Defendants' breach of fiduciary duty here caused the Plaintiffs damages, and their oppressive, fraudulent and malicious breach intended to harm Plaintiff financially as well as to cause tremendous emotional damages on him and his future relationship with the Federal Government tenants.  Plaintiff is therefore entitled to and requests exemplary damages.

374.  **As of October 31, 2019, <u>the ONLY party that has provided ALL facts and evidences to the Court are the Plaintiffs, while the Defendants continue committing fraud upon the court with repeated perjury and false statements.</u>  Given that Plaintiffs have clearly established a SUBSTANTIAL likelihood of success on the merits on ALL 19 of their claims, this Court must stop Defendants from committing further fraudulent conveyances and let the people decide the fate of this case via Jury Trial as soon as possible.**

### DEMAND FOR ATTORNEY'S FEES

Plaintiffs have been required to retain undersigned counsel to represent them in this matter and to pay undersigned counsel reasonable attorney's fee.  Defendants are responsible for such fees pursuant to the terms of the actual agreement between Plaintiffs and Defendants,  there is a provision in the contract for attorney's fees.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a Jury trial by Fourth Quarter of 2019 in this matter.

**WHEREFORE:** Plaintiffs pray for damages as follows:

1.  For General Damages subject to proof at the time of trial;

2.  For Actual Damages subject to proof at the time of trial;

3.  For Exemplary Damages subject to proof at the time of trial;

4.  That the Mortgage and Note be annulled;

5.  For Parasitic Damages subject to proof at the time of trial;

6.  For Special Damages subject to proof at the time of trial;

7.  For attorney's fees and costs;

8.  For such other and further relief as the court may deem just and proper.

DATED: October 26, 2020

RESPECTFULLY SUBMITTED,

/S/ Michael Kim

Michael Kim
mikekim2001@gmail.com
350 W. Venice Ave. #101
Venice, FL 34285
*Pro Se Plaintiff*